# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP145-FT |

| | |
|---|---|
| COMPLETE TITLE: | In the matter of the mental commitment of D. J. W.: |
| | Langlade County, |
| |       Petitioner-Respondent, |
| |    v. |
| | D. J. W., |
| |       Respondent-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 382 Wis. 2d 833,917 N.W.2d 234
(2018 – unpublished)

| | |
|---|---|
| OPINION FILED: | April 24, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 25, 2019 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Langlade |
|   JUDGE: | Gregory E. Grau |

JUSTICES:

ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which ZIEGLER, KELLY, DALLET, and HAGEDORN, JJ., joined. ROGGENSACK, C.J., filed a dissenting opinion. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion.

NOT PARTICIPATING:

ATTORNEYS:

For the respondent-appellant-petitioner, there were briefs filed by *Jeremy A. Newman,* assistant state public defender. There was an oral argument by *Jeremy A. Newman*.

For the petitioner-respondent, there was a brief filed by *Robin James Stowe,* corporation counsel. There was an oral argument by *Robin James Stowe*.

No.   2018AP145-FT
 (L.C. No.  2016ME75)

STATE OF WISCONSIN              :          IN SUPREME COURT

NOTICE

This opinion is subject to further editing and modification.  The final version will appear in the bound volume of the official reports.

**In the matter of the mental commitment of D. J. W.:**


Langlade County,

       **Petitioner-Respondent,**

   v.

**D. J. W.,**

       **Respondent-Appellant-Petitioner.**

**FILED**

**APR 24, 2020**

Sheila T. Reiff
Clerk of Supreme Court

ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which ZIEGLER, KELLY, DALLET, and HAGEGORN, JJ., joined. ROGGENSACK, C.J., filed a dissenting opinion. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion.

REVIEW of a decision of the Court of Appeals.  *Reversed.*


¶1   ANN WALSH BRADLEY, J.   The petitioner, D.J.W., seeks review of an unpublished, authored decision of the court of appeals affirming the circuit court's order extending his involuntary

commitment.[1] The court also continued his involuntary medication and treatment on an inpatient basis. D.J.W. contends that Langlade County (the County) did not present sufficient evidence of his dangerousness to sustain an extension of his involuntary commitment.

¶2 At the recommitment hearing, the County's expert witness testified that D.J.W. had lost a job, relied on his parents for housing, and received disability benefits due to schizophrenia and delusions. D.J.W. takes issue with the County's reliance on this information in demonstrating that he is "dangerous" to himself pursuant to Wis. Stat. § 51.20(1)(a)2. In response, the County asserts that taken as a whole the testimony is sufficient to determine that D.J.W. would be a proper subject for commitment if treatment were withdrawn under § 51.20(1)(am).

¶3 We determine that going forward circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. on which the recommitment is based. Further, we conclude that the evidence introduced at the recommitment hearing was insufficient to support a conclusion that D.J.W. is "dangerous" pursuant to either §§ 51.20(1)(a)2.c. or 2.d. and 51.20(1)(am).

---

[1] Langlade Cty. v. D.J.W. (D.J.W. II), No. 2018AP145-FT, unpublished slip op. (Wis. Ct. App. May 1, 2018) (affirming order of the circuit court for Langlade County, Gregory E. Grau, Reserve Judge). The appeal was decided by one judge, Judge Mark Seidl, pursuant to Wis. Stat. § 752.31(2)(d) (2017-18).

All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

¶4 Accordingly, we reverse the decision of the court of appeals.

I

¶5 On January 30, 2017, the circuit court for Langlade County[2] entered an order committing D.J.W. to the custody and care of the County for a period of six months. The circuit court determined D.J.W. to be mentally ill, dangerous, and a proper subject for treatment. Further, the circuit court ordered involuntary medication and treatment.[3]

¶6 As the expiration of D.J.W.'s initial commitment approached, the County petitioned the circuit court to extend D.J.W.'s commitment for one year. The circuit court appointed Dr. John T. Coates to examine D.J.W.

¶7 At the recommitment hearing, the County called a single witness, Dr. Coates.[4] D.J.W. testified on his own behalf and did not call any other witnesses.

¶8 Dr. Coates testified that he had diagnosed D.J.W. with schizophrenia. He further observed that D.J.W. had "a history of

_____

[2] The Honorable John B. Rhode presided at the initial commitment hearing, and the Honorable Gregory E. Grau presided at the recommitment proceedings.

[3] D.J.W. appealed his initial commitment, and the court of appeals affirmed the circuit court's order. Langlade Cty. v. D.J.W. (D.J.W. I), No. 2017AP1313-FT, unpublished slip op. (Wis. Ct. App. Nov. 7, 2017).

[4] Dr. Coates testified that he produced a report after his examination of D.J.W., but the report was never admitted into evidence at the recommitment hearing. Accordingly, the evidence presented by the County at the recommitment hearing consisted solely of Dr. Coates's testimony.

auditory and visual hallucinations" and that "[h]is thought process is illogical and again some grandiose illusions."

¶9 According to Dr. Coates's testimony, D.J.W. "did admit that he has had kind of the same hallucinations for about three years. He told me that about four months ago he saw the devil and that two months ago he was hearing voices." The doctor described D.J.W.'s illness as "treatable with psychotropic medications."

¶10 On direct examination, the attorney for the County asked Dr. Coates, "Do you have an opinion as to whether or not [D.J.W.], as a result of his current condition, is a risk of danger to himself or to others?" Dr. Coates responded:

> Well, the main danger is risk to himself if he should go off treatment. He's apt to have exacerbation of his illness. He's apt to experience, you know, hallucinations to a greater degree. Become delusional. In the past, he has had some problems with aggressive behavior and property damage. But I think the greater risk is just his inability to properly care for himself and to properly socialize if he goes untreated.

¶11 As examples of D.J.W.'s inability to properly care for himself in the event treatment were withdrawn, Dr. Coates testified:

> [H]e's living with his parents now. He quit his job because he, you know, was delusional. He has obtained disability. That disability points to the fact that he's not able to independently care for himself at this point. And he would be homeless I think if he wasn't able to live with his parents. . . . His judgment is currently still impaired. He feels that he can manage his illness in the presence of hallucinations. . . . [H]e feels that you know, hallucinations really aren't a problem for him. . . . He feels the medication is actually the problem, not his illness.

4

¶12 Dr. Coates further testified that D.J.W. was not necessarily homicidal or suicidal: "I don't know if he's highly suicidal or highly homicidal. I can say that people when they're acutely psychotic are unpredictable and their actions are unpredictable." The "major danger," as Dr. Coates saw it, was as follows:

> [I]f he goes off his medications, he will be delusional. He will be hallucinating. He will not be able to interact appropriately with others. Like I said, at the beginning of the year he quit a job because he thought he was the Messiah. So the major danger is to himself. I don't think he's necessarily a violent man that's going to go out and harm others.

¶13 In summation, Dr. Coates recommended that D.J.W. stay on his medication. He concluded that D.J.W. is "incapable of refusing medication or incompetent to refuse medication based on his inability to apply the understanding of the advantages and disadvantages and the alternatives in treating his illness."

¶14 On cross examination, Dr. Coates again emphasized that D.J.W. "harmed himself by quitting his job because he thought he was the Messiah." When asked by D.J.W.'s counsel how that is "dangerous to himself or somebody else[,]" Dr. Coates responded that "[h]e lost employment. He can't take care of himself. He can't provide for his basic needs because he can't maintain employment because he's the Messiah." Dr. Coates also reiterated on cross examination that D.J.W. had moved in with his parents and "would be homeless if it wasn't for others." However, Dr. Coates was unaware of any point at which D.J.W. had actually been homeless.

¶15 Testifying again on cross examination that D.J.W. does well while under treatment, Dr. Coates stated:

[W]hen he goes off treatment we've seen the results of that he can't care for himself, he can't maintain a job. He needs to rely on his parents for housing. He has received disability so he's been found disabled. You know, you can't have it both. You can't be disabled and say I'm fine to do whatever I want to do.

¶16 As he did on direct examination, Dr. Coates again emphasized on cross examination his view that D.J.W. was dangerous to himself but not necessarily to others:

Again, you know like I say, he quit a job in January because he was the Messiah. That is danger to himself. He, you know, lost employment because of his illness. Again, he's unable to independently care for himself. He proved that by obtaining disability. Danger in my opinion is not suicidal and homicidal ideations. Although those are possibilities.

¶17 D.J.W. also took the stand and testified. He acknowledged that he hears voices, sees things that other people cannot, and believes that he is the Messiah with a mission of "invent[ing] a way out of" global warming. Further, D.J.W. confirmed that he received help from his family, stated that he had a job on a farm, and had applied for and obtained disability benefits. He additionally expressed a dislike for his medication.

¶18 At the close of the recommitment hearing, the circuit court rendered a decision and recommitted D.J.W. for a period of one year. It determined first that D.J.W. suffers from a mental illness. Second, it concluded that his mental illness is treatable, as evidenced by the testimony that his hallucinations and delusions decreased while he had been subject to treatment.

¶19 The circuit court concluded next that D.J.W. would be a proper subject for commitment if treatment were withdrawn. On this point, it found that "given the degree of those hallucinations and delusions ultimately that course would put his judgment and perception in such a place that he would be a significant danger to himself." Accordingly, the circuit court concluded that the County met its burden under Wis. Stat. § 51.20 to recommit D.J.W.

¶20 Further, the circuit court determined that D.J.W. was "substantially incapable of applying and understanding the advantages, disadvantages and alternatives to his mental illness to the point where he can't make an informed choice as to whether to accept or refuse medication or treatment." As a result, the circuit court ordered that he be involuntarily medicated.

¶21 D.J.W. appealed, arguing that the County presented insufficient evidence of his dangerousness under Wis. Stat. § 51.20(1)(a)2. and (1)(am). The court of appeals affirmed, concluding that "the circuit court's finding of D.J.W.'s dangerousness under Wis. Stat. § 51.20(1)(am) was not clearly erroneous." Langlade Cty. v. D.J.W. (D.J.W. II), No. 2018AP145-FT, unpublished slip op., ¶10 (Wis. Ct. App. May 1, 2018).

¶22 Specifically, the court of appeals observed the circuit court's findings that (1) D.J.W. experienced significant symptoms due to his schizophrenia; (2) if treatment were withdrawn, D.J.W.'s hallucinations and delusions would "take their course" and make him a significant danger to himself; and (3) D.J.W. was incapable of understanding the advantages and disadvantages of treatment. Id. In the court of appeals' view, "[t]hese findings satisfy the

7

standard of dangerousness under § 51.20(1)(am), namely that there was a substantial likelihood D.J.W. would become a proper subject for commitment if treatment were withdrawn." Id.

II

¶23 We are asked to review the court of appeals' determination that the circuit court correctly concluded the County presented sufficient evidence that D.J.W. is dangerous pursuant to Wis. Stat. §§ 51.20(1)(a)2. and 51.20(1)(am). In a recommitment proceeding, the burden is on the County to prove by clear and convincing evidence all required facts. Wis. Stat. § 51.20(13)(e); Winnebago Cty. v. J.M., 2018 WI 37, ¶59, 381 Wis. 2d 28, 911 N.W.2d 41.

¶24 Whether the County has met its burden is a mixed question of law and fact. Waukesha Cty. v. J.W.J., 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. First, we will uphold a circuit court's findings of fact unless they are clearly erroneous. Id. A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence. Metro. Assocs. v. City of Milwaukee, 2018 WI 4, ¶62, 379 Wis. 2d 141, 905 N.W.2d 784.

¶25 Second, we review whether the facts satisfy the statutory standard. J.W.J., 375 Wis. 2d 542, ¶15. In our review, we interpret and apply Wis. Stat. § 51.20. Statutory interpretation and application are questions of law that we review independently of the determinations rendered by the circuit court and court of appeals. Metro Assocs., 379 Wis. 2d 141, ¶24.

8

III

¶26 For context, we begin by setting forth the statutory background and requirements for recommitments pursuant to chapter 51 of the Wisconsin Statutes, particularly as they pertain to the standard for "dangerousness." Next, we clarify the statutory underpinnings of this case. Subsequently, we examine the sufficiency of the evidence presented at the recommitment hearing.[5]

---

[5] Following this court's decision in Portage Cty. v. J.W.K., 2019 WI 54, 386 Wis. 2d 672, 927 N.W.2d 509, and before we had granted the petition for review in this case, we asked the parties to address the impact of that decision on the issues presented in D.J.W.'s petition for review. Specifically, the court in J.W.K. determined that J.W.K.'s appeal of his recommitment order was moot because he was no longer subject to the commitment order he was appealing. Id., ¶31.

In response to our inquiry, the parties agreed that D.J.W.'s sufficiency challenge was moot for the same reason. D.J.W. asked this court to accept the petition for review pursuant to one of the mootness exceptions. See Outagamie Cty. v. Melanie L., 2013 WI 67, ¶80, 349 Wis. 2d 148, 833 N.W.2d 607 (explaining that the court may decide an otherwise moot issue if the issue "(1) is of great public importance; (2) occurs so frequently that a definitive decision is necessary to guide circuit courts; (3) is likely to arise again and decision of the court would alleviate uncertainty; or (4) will likely be repeated, but evades appellate review because the appellate review process cannot be completed or even undertaken in time to have a practical effect on the parties"). The County urged us to deny the petition for review. We accepted the petition for review.

Neither party raised any collateral consequences that would affect our analysis. See Marathon Cty. v. D.K., 2020 WI 8, ¶¶22-25, 390 Wis. 2d 50, 937 N.W.2d 901. However, the question of the necessary evidence to support an involuntary commitment is of great importance yet often evades appellate review. Our decision on this case will give necessary guidance to circuit courts conducting involuntary commitment proceedings. Thus, we reach the merits of the parties' arguments.

A

¶27 The legislatively stated purpose of chapter 51 of the Wisconsin Statutes is "to assure the provision of a full range of treatment and rehabilitation services in the state for all mental disorders and developmental disabilities and for mental illness, alcoholism and other drug abuse." Wis. Stat. § 51.001(1). Such treatment should be given to those in need by way of "the least restrictive treatment alternative appropriate to their needs . . . ." Id.

¶28 "Because of the liberty interests affected by involuntary commitment, public policy favors outpatient treatment whenever possible . . . ." J.W.J., 375 Wis. 2d 542, ¶19. This policy is clearly set forth in the statutes: "To protect personal liberties, no person who can be treated adequately outside of a

---

After this court heard oral argument, but before we issued this decision, D.J.W. passed away. This intervening fact does not dictate a contrary result. In the criminal context, we have previously determined that "when a defendant dies while pursuing postconviction relief, . . . the defendant's right to bring an appeal continues." State v. McDonald, 144 Wis. 2d 531, 532, 424 N.W.2d 411 (1988). The right to appeal, which arises from both the constitution and statutory law, "is an integral part of a defendant's right to a final determination of the merits of the case. It serves as a safeguard to protect a defendant against errors in the criminal proceedings. A defendant who dies pending appeal . . . is no less entitled to those safeguards." Id. at 536-37.

Given the significant liberty interests at stake in a ch. 51 involuntary commitment proceeding, the same considerations are attendant here. We thus issue this opinion despite the petitioner's passing.

hospital, institution or other inpatient facility may be involuntarily treated in such a facility." Wis. Stat. § 51.001(2).

¶29 For a person to be subject to a chapter 51 involuntary commitment, three elements must be fulfilled: the subject individual must be (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous to themselves or others. Fond du Lac Cty. v. Helen E.F., 2012 WI 50, ¶20, 340 Wis. 2d 500, 814 N.W.2d 179; Wis. Stat. § 51.20(1)(a)1.-2. Each of these required elements must be proven by clear and convincing evidence. Wis. Stat. § 51.20(13)(e); J.W.J., 375 Wis. 2d 542, ¶19.

¶30 In an initial commitment proceeding, Wis. Stat. § 51.20(1)(a)2. provides five different means of demonstrating that a person is "dangerous." State v. Dennis H., 2002 WI 104, ¶14, 255 Wis. 2d 359, 647 N.W.2d 851. Pursuant to § 51.20(1)(a)2., an individual is "dangerous" if any of the following is fulfilled:

> (1) Evidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm. § 51.20(1)(a)2.a.
>
> (2) Evidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm. § 51.20(1)(a)2.b.
>
> (3) Evidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals. § 51.20(1)(a)2.c.

11

(4) Evidences behavior manifested by recent acts or omissions that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness. § 51.20(1)(a)2.d.

(5) For an individual, other than an individual who is alleged to be drug dependent or developmentally disabled, after the advantages and disadvantages of and alternatives to accepting a particular medication or treatment have been explained to him or her and because of mental illness, evidences either incapability of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives, or substantial incapability of applying an understanding of the advantages, disadvantages, and alternatives to his or her mental illness in order to make an informed choice as to whether to accept or refuse medication or treatment; and evidences a substantial probability, as demonstrated by both the individual's treatment history and his or her recent acts or omissions, that the individual needs care or treatment to prevent further disability or deterioration and a substantial probability that he or she will, if left untreated, lack services necessary for his or her health or safety and suffer severe mental, emotional, or physical harm that will result in the loss of the individual's ability to function independently in the community or the loss of cognitive or volitional control over his or her thoughts or actions. § 51.20(1)(a)2.e.

¶31 Upon the impending expiration of an initial six-month commitment, a county may seek an extension of the commitment for a period not to exceed one year. Wis. Stat. § 51.20(13)(g)1., (13)(g)3.; Portage Cty. v. J.W.K., 2019 WI 54, ¶¶17-18, 386 Wis. 2d 672, 927 N.W.2d 509. To prevail in a recommitment proceeding, the County must prove the same elements necessary for

12

the initial commitment by clear and convincing evidence——that the patient is (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous to themselves or others. J.W.J., 375 Wis. 2d 542, ¶20; J.M., 381 Wis. 2d 28, ¶59 (citing Wis. Stat. § 51.20(1)(a), (13)(e)).

¶32 In a recommitment proceeding, however, there is an additional manner of proving dangerousness provided by Wis. Stat. § 51.20(1)(am). "Because an individual's behavior might change while receiving treatment, Wis. Stat. § 51.20(1)(am) provides a different avenue for proving dangerousness if the individual has been the subject of treatment for mental illness immediately prior to commencement of the extension proceedings . . . ." J.W.K., 386 Wis. 2d 672, ¶19. Pursuant to § 51.20(1)(am),

> If the individual has been the subject of inpatient treatment for mental illness . . . immediately prior to commencement of the proceedings as a result of . . . a commitment or protective placement ordered by a court under this section . . . the requirements of a recent overt act, attempt or threat to act under par. (a)2.a. or b., pattern of recent acts or omissions under par. (a)2.c. or e., or recent behavior under par. (a)2.d. may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn.

¶33 Wisconsin Stat. § 51.20(1)(am) "recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur." J.W.K., 386 Wis. 2d 672, ¶19. "However,

13

dangerousness remains an element to be proven to support both the initial commitment and any extension." Id.

¶34 Indeed, "[t]he County must prove the individual 'is dangerous.'" Id., ¶24 (citing Wis. Stat. § 51.20(1)(a)2. and (13)(g)3.). It is not enough that the individual was at one point dangerous. Thus, "[e]ach extension hearing requires proof of current dangerousness." Id. The evidentiary pathway set forth by sub. (1)(am) "acknowledges that an individual may still be dangerous despite the absence of recent acts, omissions, or behaviors exhibiting dangerousness outlined in § 51.20(1)(a)2.a-e." but it "does not change the elements or quantum of proof required." Id.

B

¶35 With the above background in hand, we next clarify the statutory underpinnings of this case.

¶36 The statutory basis for D.J.W.'s commitment in this case has been somewhat of a moving target. It was not clear at either the initial commitment hearing or the extension hearing on which subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. the commitment was based.

¶37 After D.J.W. was initially committed, he appealed that commitment. In affirming the initial commitment, the court of appeals specifically determined that the subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. under which commitment was appropriate was § 51.20(1)(a)2.d. Langlade Cty. v. D.J.W. (D.J.W. I), No. 2017AP1313-FT, unpublished slip op., ¶14 (Wis. Ct. App. Nov. 7,

14

2017). That is, it determined that D.J.W. met the following standard of dangerousness:

> Evidences behavior manifested by recent acts or omissions that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness.

§ 51.20(1)(a)2.d.

¶38 In the court of appeals in the present appeal, the County's brief did not cite any specific subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. under which it argued that D.J.W. was dangerous. Accordingly, D.J.W. reasonably followed the formulation of the court of appeals with regard to the initial commitment, and at the outset of his oral argument before this court set forth the relevant statutory provisions as § 51.20(1)(a)2.d. and (1)(am).

¶39 However, in its oral argument before this court, the County apparently took a new tack and asserted that D.J.W. would be a proper subject for commitment in the event treatment were discontinued not under subd. para. 2.d., but under 2.c. Pursuant to Wis. Stat. § 51.20(1)(a)2.c., one is a proper subject for commitment if that person "[e]vidences such impaired judgment manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals."

¶40 The record in this case is therefore quite unhelpful in guiding this court's analysis. We have received conflicting messages from the County and the court of appeals regarding the statutory basis for this commitment. In order to avoid this problem in the future, we determine that going forward circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of § 51.20(1)(a)2. on which the recommitment is based.[6]

¶41 Such a requirement is manifest in the language of Wis. Stat. § 51.20(1)(am), which references the dangerousness pathways of § 51.20(1)(a)2. Specifically, pursuant to § 51.20(1)(am),

---

[6] Justice Rebecca Grassl Bradley's dissent asserts that the guidance we offer in this opinion is redundant to that provided in D.K., 390 Wis. 2d 50. Justice Rebecca Grassl Bradley's Dissent, ¶124. It contends that we should simply dismiss this case as moot and not decide the substantive issues before us. Id., ¶116.

However, D.K. mandated no such rule as we do in the present case. The majority/lead opinion indicated only that the circuit court "could have made more detailed and thorough factual findings and clarified its legal conclusions." D.K., 390 Wis. 2d 50, ¶55 (Ziegler, J., joined by Roggensack, C.J., and Hagedorn, J.) (emphasis added). Such a determination creates no clear requirement such as that contained in this opinion.

Likewise, the concurrence in D.K. indicated that "[b]ecause circuit courts bear the responsibility of determining whether the evidence satisfies the statutory standard, circuit courts must expressly make independent factual findings on the record, separate from any legal conclusions." Id., ¶68 n.4 (Rebecca Grassl Bradley, J., concurring, joined by Kelly, J.). Even if this language can be read as a directive to circuit courts, it sets forth the position of two justices only and does not create any binding holding. Rather than leaving circuit courts to discern a mandatory rule from the suggestive language contained in separate opinions in D.K., our conclusion in the present case aims to provide clarity for circuit courts going forward.

16

the requirements of a recent overt act, attempt or threat to act under par. (a)2.a. or b., pattern of recent acts or omissions under par. (a)2.c. or e., or recent behavior under par. (a)2.d. may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn. (Emphasis added).

Para. (1)(am) thus mandates that circuit courts ground their conclusions in the subdivision paragraphs of subd. 2.

¶42 Further, the purpose of making specific factual findings with reference to a subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. is twofold. First, it provides clarity and extra protection to patients regarding the underlying basis for a recommitment. The United States Supreme Court "repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." Addington v. Texas, 441 U.S. 418, 425 (1979). "Freedom from physical restraint is a fundamental right that 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.'" State v. Post, 197 Wis. 2d 279, 302, 541 N.W.2d 115 (1995) (quoting Foucha v. Louisiana, 504 U.S. 71, 80 (1992)).

¶43 With such an important liberty interest at stake, the accompanying protections should mirror the serious nature of the

17

proceeding.[7]  Requiring circuit courts to provide specific factual findings with reference to the subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. on which the recommitment is based provides increased protection to patients to ensure that recommitments are based on sufficient evidence.

¶44  Second, a requirement of specific factual findings with reference to a subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. will clarify issues raised on appeal of recommitment orders and ensure the soundness of judicial decision making, specifically with regard to challenges based on the sufficiency of the evidence. See Klinger v. Oneida Cty., 149 Wis. 2d 838, 846-47, 440 N.W.2d 348 (1989) ("[A]s this court has stated many times, the circuit court must make a record of its reasoning to ensure the soundness of its own decision making and to facilitate judicial review.").  A more substantial record will better equip appellate courts to do their job, further ensuring meaningful appellate review of the evidence presented in recommitment proceedings.

¶45  In this case, in the absence of explicit factual findings with reference to any subdivision paragraph of Wis. Stat.

_____

[7] The stakes of a recommitment proceeding are further heightened when involuntary medication is a possibility. Administration of psychotropic drugs is no small matter. See K.N.K. v. Buhler (Matter of Guardianship of K.N.K.), 139 Wis. 2d 190, 207 n.3, 407 N.W.2d 281 (Ct. App. 1987); In re Guardianship of Roe, 421 N.E.2d 40, 53 (Mass. 1981) (explaining that antipsychotic medication "[is] powerful enough to immobilize mind and body[,]" has a "profound effect . . . on the thought processes of an individual[,]" and has a "well-established likelihood of severe and irreversible adverse side effects . . . .").

18

§ 51.20(1)(a)2., we will address the arguments made in this case as they relate to § 51.20(1)(a)2.d., on which the court of appeals determined the initial commitment was based, and § 51.20(1)(a)2.c., on which the County relied at oral argument.[8] In the future, such guesswork will be avoided by our newly instituted requirement for specific factual findings with reference to a subdivision paragraph of § 51.20(1)(a)2.[9]

IV

¶46 We now turn to examine the sufficiency of the evidence presented at the recommitment hearing in this case to support a determination of dangerousness.

¶47 At the outset of our examination of this question, we observe that the court of appeals in this case applied a clearly erroneous standard of review to a determination of dangerousness. D.J.W. II, No. 2018AP145-FT, unpublished slip op., ¶10. A determination of dangerousness is not a factual determination, but a legal one based on underlying facts. The court of appeals thus erred by applying the standard of review for findings of fact to

---

[8] Chief Justice Roggensack's dissent would justify recommitment pursuant to the "fifth standard" set forth by Wis. Stat. § 51.20(1)(a)2.e. Chief Justice Roggensack's Dissent, ¶61. Neither party raised this argument. At oral argument, the County conceded that it relies on subd. para. 2.c. only and counsel for D.J.W. indicated that "this case has never been a fifth standard case. It wasn't alleged by the County either in the original commitment or in this extension as a fifth standard case."

[9] We recognize that there may be cases where a person satisfies the criteria contained in several statutory subdivision paragraphs. In such a case, we encourage circuit courts to state each subdivision paragraph that is fulfilled.

a legal determination of dangerousness. See Metro. Assocs., 379 Wis. 2d 141, ¶25 ("Factual findings made by the circuit court will not be disturbed unless they are clearly erroneous."). Whether facts satisfy the statutory standard must be reviewed independently of the determinations rendered by the circuit court and court of appeals. J.W.J., 375 Wis. 2d 542, ¶15.

¶48 D.J.W. contends that Dr. Coates's testimony was insufficient to support the extension of his commitment because it does not establish that he is dangerous as is required. He characterizes Dr. Coates's testimony as establishing only that as a result of his mental illness he lost his job, sought and received disability benefits, and would be homeless were it not for his family. In D.J.W.'s view, none of these propositions provides any evidence that he is "dangerous" under Wis. Stat. § 51.20(1)(a)2.d.

¶49 The County, on the other hand, argues that Dr. Coates's testimony is sufficient to establish that D.J.W. is dangerous to himself. It focuses its argument on Dr. Coates's testimony that D.J.W. suffers from impaired judgment and delusions that would be exacerbated if he were to discontinue treatment.

¶50 We agree with D.J.W. that the evidence presented at the recommitment hearing is insufficient to support a conclusion that he is "dangerous" within the meaning of the commitment statute. First, we focus on whether the introduced testimony meets the standard for dangerousness set by Wis. Stat. § 51.20(1)(a)2.d., as viewed through the lens of § 51.20(1)(am). That is, the testimony must provide sufficient evidence to support the conclusion that D.J.W. would be "unable to satisfy basic needs for nourishment,

medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue[,]" § 51.20(1)(a)2.d., if treatment were withdrawn. § 51.20(1)(am).

¶51 Dr. Coates's testimony provided no evidence that "death, serious physical injury, serious physical debilitation, or serious physical disease" would ensue if treatment were withdrawn. Instead, Dr. Coates testified only that if treatment is withdrawn, D.J.W. "can't care for himself" in various ways, including being unable to maintain a job, having to rely on disability for income, and living with family.

¶52 The doctor's testimony further indicated that discontinuing treatment would exacerbate D.J.W.'s illness and that as a result he would "experience . . . hallucinations to a greater degree." Dr. Coates stated that "the greater risk is just his inability to properly care for himself and to properly socialize if he goes untreated."

¶53 Inability to care for oneself does not equate with a "substantial probability" that "death, serious physical injury, serious physical debilitation, or serious physical disease" would ensue if treatment were withdrawn. Nothing in Dr. Coates's testimony even hints at a serious physical consequence to D.J.W. if treatment were to be discontinued. His testimony on this subject relied only on generalized propositions with regard to people with schizophrenia, not anything specific to D.J.W. For example, Dr. Coates indicated that "[d]anger in my opinion is not

21

suicidal and homicidal ideations. Although those are possibilities. There is an increased risk of suicide in people with schizophrenia. That's just a statistical fact."

¶54 Further, the County's argument is at odds with United States Supreme Court precedent. Specifically, in O'Connor v. Donaldson, 422 U.S. 563, 576 (1975), the Court determined that "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends."

¶55 Again, Dr. Coates's testimony established only that if treatment were withdrawn, D.J.W. would be unable to maintain a job, would have to rely on disability for income, and would have to live with family. As detailed above, the testimony does not support a determination that D.J.W. was dangerous. Without more, and given that D.J.W.'s family demonstrated willingness to help, recommitment based on this record would run afoul of O'Connor.

¶56 We now turn to an examination of Dr. Coates's testimony through the lens of Wis. Stat. § 51.20(1)(a)2.c. Subd. para. 2.c., in combination with para. (1)(am), provides that "dangerousness" in a recommitment can be shown if a person would "[e]vidence[] such impaired judgment . . . that there is a substantial probability of physical impairment or injury to himself or herself or other individuals" if treatment were withdrawn.

¶57 The County's argument fares no better under subd. para. 2.c. than it does under 2.d. Again, no testimony was offered at the recommitment hearing that would support a determination of any

22

"substantial probability of physical impairment or injury" that may inure to D.J.W. specifically in the event treatment were withdrawn. A diagnosis of schizophrenia, by itself, does not demonstrate the requisite "substantial probability of physical impairment." If it did, the statutory elements of mental illness and dangerousness would be merely redundant.

¶58 Accordingly, we conclude that the evidence introduced at the recommitment hearing was insufficient to support a conclusion that D.J.W. is "dangerous" pursuant to either Wis. Stat. §§ 51.20(1)(a)2.c. or 2.d. and 51.20(1)(am).

V

¶59 In sum, we determine that going forward circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of § 51.20(1)(a)2. on which the recommitment is based. Further, we conclude that the evidence introduced at the recommitment hearing was insufficient to support a conclusion that D.J.W. is "dangerous" pursuant to either Wis. Stat. §§ 51.20(1)(a)2.c. or 2.d. and 51.20(1)(am).

¶60 Accordingly, we reverse the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

23

¶61 PATIENCE DRAKE ROGGENSACK, C.J. *(dissenting).* The majority opinion concludes that D.J.W.'s commitment was erroneously extended under Wis. Stat. § 51.20(1)(am) by the circuit court and that the court of appeals erred by affirming. The majority reverses because it concludes that "the evidence introduced at the recommitment hearing was insufficient to support a conclusion that D.J.W. is 'dangerous' pursuant to either §§ 51.20(1)(a)2.c. or 2.d. and 51.20(1)(am)."[1] Although I understand why the majority chose to evaluate the evidence that was presented under § 51.20(1)(a)2.c. and 2.d., the majority errs because the evidence fully satisfies the "fifth criterion" for dangerousness found in § 51.20(1)(a)2.e., which we carefully explained in State v. Dennis H., 2002 WI 104, 255 Wis. 2d 359, 647 N.W.2d 851.

¶62 I write in dissent not only because the majority errs but also because it is important for this court, and all Wisconsin courts who adjudicate civil commitments and recommitments under Wis. Stat. ch. 51, to recognize that there is a category of seriously mentally ill individuals whose symptoms are described in Wis. Stat. § 51.20(1)(a)2.e. They are dangerous to themselves because their illness prevents them from understanding the advantages and disadvantages of treatment and, as demonstrated by their treatment history, they need care or treatment to prevent further disability or deterioration and they have a substantial probability, if left untreated, of losing the ability to function

---

[1] Majority op., ¶3.

1

independently in the community or of losing cognitive or volitional control over their thoughts or actions.

¶63 These seriously, mentally ill individuals often are very fragile, and when they do not receive the care they need, they are a significant danger to themselves even when not overtly suicidal.[2] Wisconsin Stat. § 51.20(1)(a)2.e.'s fifth criterion of dangerousness forms an appropriate basis for evaluation of these individuals. The majority should have so employed it to evaluate the evidence presented in regard to D.J.W., which evidence fully satisfies § 51.20(1)(a)2.e.'s criterion for dangerousness. Accordingly, I respectfully dissent from the majority opinion.

## I. BACKGROUND

¶64 D.J.W. had a long history of mental illness that began to be recorded in October of 2016 with his emergency detention. The Statement of Emergency Detention relayed that D.J.W. had "somatic delusions" and believed that he had parasites in his intestines. It was reported that D.J.W. was vomiting his food because he believed that medicine was being placed in it; that he was paranoid; that he "believes that the devil had tap[p]ed him on the shoulder;" that due to his "current altered state he is not able to care for himself;" and that his mother reported that she is concerned for her safety because D.J.W. was standing outside of her bedroom door with a knife in his hand.

¶65 D.J.W.'s medical records reveal that in October of 2016, he reported hearing "the devil who tells him to destroy himself by

---

[2] Darold A. Treffert, M.D., The MacArthur Coercion Studies: A Wisconsin Perspective, 82 Marq. L. Rev. 759 (1999) (discussing the balance of the right to be sick with the right to be rescued).

2

various actions." He also reported that he has "learned to ignore the devil and is not afraid of the devil." His assessment in 2016 evaluated him as a "moderate risk" for suicide and noted that two of D.J.W.'s cousins committed suicide.

¶66 In 2016, D.J.W., with the advice of counsel, entered into a court approved settlement agreement, wherein he agreed to take all prescribed doses of psychotropic medications and keep all psychiatric and psychological appointments. However, D.J.W. said that when the settlement term ended, he would stop complying with its requirements. This resulted in his detention at North Central Health Care, in Wausau, Wisconsin.

¶67 Langlade County petitioned for his commitment pursuant to ch. 51. A hearing on Langlade County's petition was held on January 30, 2017. Dr. John T. Coates, M.D., a psychiatrist, was retained by the County to examine D.J.W. He did so.

¶68 Dr. Coates filed his report on January 25, 2017, after he met with D.J.W., who largely "exercised his right to remain silent." Dr. Coates reported that D.J.W. did "not believe that he was mentally ill or in need of medication" and "claims that he is the Messiah who has been sent from God to save humanity." Dr. Coates noted that D.J.W. was hearing voices, having hallucinations, had persecutory delusions and impaired judgment. He diagnosed D.J.W. as suffering from schizophrenia and cannabis use disorder.

¶69 In his report, Dr. Coates noted that D.J.W. was a "significant risk of dangerousness" to himself, also to others and that he is unable to independently care for himself. He noted

3

that D.J.W. had a history of "aggressive behavior and property damage." He recommended commitment in an institution. However, he opined that "eventually" D.J.W.'s care and treatment could be provided as an outpatient. He stated that he had explained the advantages and disadvantages of accepting medication or treatment, but that D.J.W.'s mental illness was preventing his understanding and that he was "substantially incapable of applying an understanding" of the advantages and disadvantages of treatment due to his mental illness.

¶70 The County also retained Dr. Nicholas Starr, a psychologist, to examine D.J.W. D.J.W. refused to participate in Dr. Starr's examination. Therefore, Dr. Starr's examination was limited to D.J.W.'s medical records. His report, based on this review, concluded that D.J.W. was mentally ill and dangerous because there was "[a] substantial probability of physical harm to himself . . . as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm." He said D.J.W. was dangerous because there was a "substantial probability, as demonstrated by both . . . [his] treatment history and [his] . . . recent acts or omissions, that [he] . . . needs care or treatment to prevent further disability or deterioration."

¶71 Dr. Starr noted that D.J.W. was "passively suicidal," and that he questioned the point of living. He, too, recommended treatment in a locked institution, but said that when D.J.W. is stabilized by medication, he could be released to outpatient treatment.

4

¶72 At the commitment hearing held January 30, Dr. Coates testified consistent with his report.[3] He explained that although D.J.W. was seriously mentally ill, his condition, schizophrenia, is treatable with psychotropic medication, counseling and behavioral adjustments. He said that D.J.W. does not believe he is schizophrenic or in need of medications. He believes that others can hear his thoughts, so he has no privacy. He opined that D.J.W. was more of a danger to himself, but due to past aggressive behaviors, he was a danger to others as well. He explained that D.J.W. was unpredictable and unable to care for himself when in an acute psychotic state. He testified that at the time of the hearing the least restrictive treatment would be in an institution, initially.

¶73 D.J.W. also testified. He said that he is fully aware that he sees and hears things that others do not see or hear. He said that if commitment was not ordered, he would not continue outpatient treatment. He does not believe the medicine or counseling helped him.

¶74 The court concluded that D.J.W. was dangerous due to his mental illness and ordered a six month commitment for care and medication.

¶75 On June 16, 2017, in advance of the expiration of D.J.W.'s six month commitment, a Petition for Recommitment was commenced pursuant to Wis. Stat. § 51.20(1)(am). Outpatient treatment with community supports in place was requested. The petition did not state whether the County was relying on a

---

[3] The Honorable John B. Rhode presided.

§ 51.20(1)(a)2. criterion of dangerousness for its recommitment petition. A hearing was set for July 18, 2017. It is the recommitment order that resulted from this hearing that is now before us.

¶76 Dr. John Coates was again retained to examine D.J.W. and to file a report at least 48 hours before the hearing. He did so, filing his report on July 3, 2017. His report explained that D.J.W. had a defiant attitude, and that D.J.W. said he saw the devil three months ago and last heard voices two months ago. Dr. Coates opined that D.J.W.'s thought process was impaired and delusional. He said that if treatment were withdrawn, D.J.W. would be unable to care for himself, and that he has a history of aggressive behavior that concerned him. He recommended extending D.J.W.'s commitment for 12 months, with medication, and that treatment could be provided outside an institution.

¶77 Dr. Coates reported that he had explained the advantages and disadvantages of accepting treatment and medication to D.J.W., but that he was "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives [due] to his [] mental illness . . . in order to make an informed choice as to whether to accept or refuse medication or treatment."

¶78 At the July 18, 2017 hearing, Dr. Coates testified by telephone consistent with his report.[4] He explained that D.J.W. has "a history of auditory and visual hallucinations. His thought process is illogical and has some grandiose illusions." He repeated in his testimony that D.J.W. had told him that he saw the

---

[4] The Honorable Gregory Grau presided.

devil four months ago and last heard voices two months ago. Dr. Coates opined that D.J.W.'s schizophrenia is treatable with psychotropic medication, and that he was showing a response to the medication he has been receiving.

¶79 When asked if D.J.W. was a danger to himself or to others, Dr. Coates said that "the main danger is risk to himself if he should go off treatment." If he does so, his illness will be exacerbated and he will lose his ability to properly care for himself.

¶80 Dr. Coates said that D.J.W. had a month's institutionalization in January because he was very delusional and had quit his job because he thought he was the Messiah sent from God to save humanity. He was hearing voices on a daily basis and thought others could hear his thoughts. He also did not believe he was mentally ill, but rather, a psychic. Dr. Coates testified that D.J.W. believes that "he can manage his illness in the presence of hallucinations" and without medication. D.J.W. believed that Haldol, which he was receiving, is disabling him, rather than a mental illness.

¶81 Dr. Coates said that "dangerousness to others is unpredictable." He explained that, "I don't believe that he's an aggressive-type person who is apt to act out, but you can't predict the behavior when someone is acutely psychotic." He also said, he is a danger to himself and "unable to independently care for himself." He said that danger "is not suicidal and homicidal ideations. Although those are possibilities. There is an increased risk of suicide in people with schizophrenia."

7

¶82 Counsel for Langlade County asked Dr. Coates whether:

[I]s it accurate to say that if the subject individual in the past, there has been no evidence that that subject has made a suicidal threat to harm himself or herself, that when you do this examination, that you still can have a finding or express a medical opinion that that individual may present a suicide risk if treatment were withdrawn?

Dr. Coates answered, "Yes."

¶83 Counsel continued:

Q.    Doctor, I note in your report when to the question does this individual present a significant risk of dangerousness at this time or if treatment were to be withdrawn, you've basically checked all the statutory criteria      that      constitutes      risk      of dangerousness. . . . [I]f      treatment      were      to      be withdrawn, then he would meet, in your opinion, all of those four criteria for dangerousness?

A.    . . . [I]f treatment were withdrawn, all four of those things would be more evident. . . . [H]e's not able to independently care for himself at this point. And he would be homeless I think if he wasn't able to live with his parents. . . .   His judgment is currently still impaired.  He feels that he can manage his illness in the presence of hallucinations.

¶84 D.J.W. testified at the July hearing, as he had in January.  He said that he first sought help because he "felt suicidal at the time."  He said that he was hospitalized for one week, during which time he received medication.  After he was discharged he stopped taking the medications.

¶85 D.J.W. said that his next hospitalization was at North Central Health Care, where he stayed for two weeks.  He said that after discharge he did continue with medications, but they "didn't affect me."  He said that he told his doctor that he "had not

8

intended to continue taking the meds after the settlement agreement expired." That's when commitment was proposed.

¶86 He acknowledged that he had damaged property at his parent's residence, but asserted that no person was harmed. He explained that he did not need community services because his parents or his sister would help him with food and housing, as they had in the past. He said his current medication, Haldol, hurts, rather than helps him. He said that he was not then hearing voices or seeing things others do not see. That they had "stopped recently."

¶87 In closing, Langlade's counsel argued that the only medical testimony that was presented, that of Dr. Coates, provided clear and convincing evidence that D.J.W. has a mental illness, schizophrenia, which is treatable. He explained because the County is proceeding under Wis. Stat. 51.20(1)(am) for recommitment, recent dangerous acts or thoughts are not required, but rather the court must look at D.J.W.'s whole record. Counsel pointed out that in regard to dangerousness, Dr. Coates testified that if treatment were withdrawn, D.J.W. would become dangerous to himself.

¶88 Counsel for D.J.W. argued that D.J.W. objected to medication and that he was fine when he was not on it. She acknowledged that the first time he checked himself into a facility for voluntary services he was having suicidal thoughts. She pointed out, however, that he did not act on those thoughts.

¶89 The circuit court found that D.J.W. suffered from a mental illness, schizophrenia, which is treatable. The court also

found that D.J.W. does not believe that he suffers from schizophrenia. The court cited D.J.W.'s testimony that recently the hallucinations and delusions have decreased. The court found that this seems to evidence a response to the treatment he has been receiving.

¶90 The court found that if the treatment were withdrawn, D.J.W. would be a proper subject for commitment because of the severity of the hallucinations and delusions he has suffered in the past. If that were to occur, D.J.W.'s judgment and perception would be affected such that he would be a "significant danger to himself." The court explained that D.J.W. is "substantially incapable of applying and understanding the advantages, disadvantages and alternatives to his mental illness to the point where he can't make an informed choice as to whether to accept or refuse medication or treatment." The court then continued D.J.W.'s commitment as an outpatient, and found that because medication and treatment will continue to have therapeutic value, they were ordered.

## II. DISCUSSION

### A. Standard of Review

¶91 This case presents as a claim that the evidence was not sufficient to recommit D.J.W. pursuant to Wis. Stat. § 51.20(1)(am) because there was insufficient evidence of dangerousness. In order to evaluate the evidence presented under the required statutory standard, we interpret and apply § 51.20(1)(am) and § 51.20(1)(a)2. We interpret and apply statutes independently of the court of appeals' and circuit court's

decisions, while benefitting from their discussions. <u>Daniel v. Armslist, LLC</u>, 2019 WI 47, ¶13, 386 Wis. 2d 449, 926 N.W.2d 710.

¶92 When the sufficiency of evidence is challenged, we sustain the circuit court's findings of fact unless they are clearly erroneous. <u>State v. Anderson</u>, 2019 WI 97, ¶20, 389 Wis. 2d 106, 935 N.W.2d 285. Findings of fact are clearly erroneous when they are "contrary to the great weight and clear preponderance of the evidence." <u>Richards v. First Union Sec., Inc.</u>, 2006 WI 55, ¶12, 290 Wis. 2d 620, 714 N.W.2d 913. We independently determine whether the facts fulfill statutory standards, again while benefitting from prior courts' discussions. <u>Westmas v. Creekside Tree Serv., LLC</u>, 2018 WI 12, ¶17, 379 Wis. 2d 471, 907 N.W.2d 68.

### B. Recommitment

#### 1. Civil Commitment Generally

¶93 The role that the State of Wisconsin has taken in civil commitments has moved like a pendulum. For example, in the early 1970s, civil commitments of mentally ill individuals in Wisconsin were easily obtained, which came to national attention with the issuance of <u>Lessard v. Schmidt</u>, 349 F. Supp. 1078 (E.D. Wis. 1972), <u>vacated on other grounds</u>, 414 U.S. 473 (1974) (per curiam). In 1972, many individuals had been institutionalized without well-defined procedural standards. <u>Lessard</u>, a class action, was brought on behalf of persons who were being held involuntarily under emergency, temporary or permanent commitment provisions of Wisconsin statutes. <u>Id.</u> at 1082.

¶94 The federal district court panel reasoned that the "power of the state to deprive a person of the fundamental liberty

11

to go unimpeded about his or her affairs must rest on a consideration that society has a compelling interest in such deprivation." Id. at 1084. The court noted that it is the role of courts to review procedural guarantees of due process that commitment statutes should provide. Id. at 1086. Court review was necessary because "the commitment adjudication carries with it an enormous and devastating effect on an individual's civil rights." Id. at 1089.

¶95 The court in Lessard, set out procedural requirements in protection of civil rights of civil committees: notice and an opportunity to be heard, id. at 1091; proof that commitment was required because the individual poses a serious danger of harm to others or himself, id. at 1095; the right to counsel, id. at 1097; and the privilege against self-incrimination, id. at 1100, to name a few required protections.

¶96 In 1976, Wisconsin significantly amended its procedural standards for civil commitment, accepting most of Lessard's conclusions. Many individuals were released from institutions, in part because the amended standards for dangerousness were difficult to meet.[5]

¶97 While the release of mentally ill persons who did not require institutionalization to treat their illnesses was very important, the change in the law also created obstacles that prevented families and those concerned with obtaining care for the mentally ill from being able to do so. This change resulted in a significant increase in homelessness for mentally ill individuals,

---

[5] Treffert, 82 Marq. L. Rev. 759.

which began to be recognized.[6] Accordingly, the pendulum on civil commitment for treatment began to swing back toward greater intervention and care for the lives of those who were chronically mentally ill.[7]

¶98 Of importance in the matter before us, is the statutory amendment that recognized that mental illness, itself, may render the individual incapable of recognizing his or her illness and accepting treatment. Wisconsin Stat. § 51.20(1)(a)2.e. is Wisconsin's response to this concern. It focuses on dangerousness to self that can arise when, due to mental illness, the individual is incapable of understanding or applying advantages and disadvantages of treatment or medication and if left untreated, will suffer severe mental, emotional or physical harm. Also important here is § 51.20(1)(am), which is employed for recommitments for treatment as addressed below.

### 2. D.J.W.'s Recommitment

¶99 The matter before us is a recommitment. To recommit an individual, the county is required to prove by clear and convincing evidence that the individual is: (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous. Portage Cty. v. J.W.K., 2019 WI 54, ¶18, 386 Wis. 2d 672, 927 N.W.2d 509.

---

[6] See generally, Steven K. Erickson, Michael J. Vitacco and Gregorgy J. Van Rybroek, Beyond Overt Violence: Wisconsin's Progressive Civil Commitment Statute As a Marker of a New Era in Mental Health Law, 89 Marq. L. Rev. 358 (2005).

[7] Darold A. Treffert, 1995 Wisconsin Act 292: Finally, the Fifth Standard, Wis. Med. J., Aug. 1996 (explaining that Act 292 was necessary for individuals who were being disenfranchised from treatment and care post-Lessard when they were obviously seriously ill and deteriorating).

¶100 Wisconsin Stat. § 51.20(1)(am) provides statutory requirements that a county must meet. They differ from the requirements for an initial commitment. Section 51.20(1)(am) provides in relevant part:

> If the individual has been the subject of inpatient treatment for mental illness . . . immediately prior to commencement of the proceedings as a result of . . . a commitment . . . ordered by a court under this section . . . or if the individual has been the subject of outpatient treatment for mental illness . . . immediately prior to commencement of the proceedings as a result of a commitment ordered by a court under this section, the requirements of a recent overt act, attempt or threat under . . . par. (a)2.c. or e., . . . may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn.

As the court of appeals explained, § 51.20(1)(am) avoids "the 'revolving door' phenomena whereby there must be proof of a recent overt act to extend the commitment but because the patient was still under treatment, no overt acts occurred and the patient was released from treatment only to commit a dangerous act and be recommitted." State v. W.R.B., 140 Wis. 2d 347, 351, 411 N.W.2d 142 (Ct. App. 1987). Accordingly, a petition for recommitment brings before the court the individual's complete mental health record.

¶101 Under Wis. Stat. § 51.20(1)(am), the circuit court was not limited to considering D.J.W.'s acts or omissions that occurred immediately before the petition for recommitment was filed. Id. The circuit court's findings may be based on acts or omissions that occurred prior to the initial commitment and are documented

14

in his medical records, as well as psychiatric examination reports and testimony presented at hearings.

¶102 Wisconsin Stat. § 51.20(1)(am) requires proof that: (1) the individual has been the subject of either inpatient or outpatient treatment for mental illness; (2) immediately before the recommitment petition was filed; (3) which treatment was court ordered; and (4) based on the subject individual's treatment record, there is a substantial likelihood that the individual would be a proper subject for commitment if treatment were withdrawn.

¶103 In the matter before us, D.J.W. easily meets the first three requirements of Wis. Stat. § 51.20(1)(am) based on D.J.W.'s mental health records. Furthermore, there is no dispute that D.J.W. received inpatient treatment and outpatient treatment for mental illness immediately before the recommitment petition was filed and that his treatment was court ordered. Those findings are not clearly erroneous.

¶104 Because the fourth requirement of Wis. Stat. § 51.20(1)(am) directs that there must be "a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn," and because commitments require a finding of dangerousness, recommitments also require a substantial likelihood of dangerousness to self or others if treatment were withdrawn. J.W.K., 386 Wis. 2d 672, ¶19.

¶105 In Wis. Stat. § 51.20(1)(a)2.a.-e., the legislature set out five criteria through which dangerousness may be shown in the course of a commitment. Wisconsin Stat. § 51.20(1)(am) does not

15

directly incorporate these standards but relates that § 51.20(1)(a)2.a.-e. are satisfied when there is a "substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." Accordingly, subd. para. 2.a.-e. provides an assist to my interpretation of how dangerousness may be shown in a recommitment proceeding.

¶106 Of relevance, given the factual underpinning of the case before us, is the fifth criterion for dangerousness, Wis. Stat. § 51.20(1)(a)2.e. It is my focus because of the effect that D.J.W.'s mental illness has had on his ability to evaluate treatment and care options and make a rational decision about whether to accept them or not. As we have explained, subd. para. 2.e. "applies to mentally ill persons whose mental illness renders them incapable of making informed medication decisions and makes it substantially probable that, without treatment, disability or deterioration will result, bringing on a loss of ability to provide self-care or control thoughts or actions." Dennis H., 255 Wis. 2d 359, ¶33.

¶107 Wisconsin Stat. § 51.20(1)(a) provides in relevant part:

> 2. The individual is dangerous because he or she does any of the following:
>
> . . . .
>
> e. For an individual, other than an individual who is alleged to be drug dependent or developmentally disabled, after the advantages and disadvantages of and alternatives to accepting a particular medication or treatment have been explained to him or her and because of mental illness, evidences . . . [has a] substantial incapability of applying an understanding of the advantages, disadvantages, and alternatives to his or

16

her mental illness in order to make an informed choice as to whether to accept or refuse medication or treatment; and evidences a substantial probability, as demonstrated by both the individual's treatment history and his or her recent acts or omissions, that the individual needs care or treatment to prevent further disability or deterioration and a substantial probability that he or she will, if left untreated, lack services necessary for his or her health or safety and suffer severe mental, emotional, or physical harm that will result in the loss of the individual's ability to function independently in the community or the loss of cognitive or volitional control over his or thoughts or actions.

¶108 In Dennis H., we set out five requirements of Wis. Stat. § 51.20(1)(a)2.e.: First, the person must be mentally ill. Id., ¶19. Second, the person must be "incompetent to make medication or treatment decisions" due to his mental illness. Id., ¶21. Incompetence may be shown by a "substantial incapability of applying an understanding of the advantages, disadvantages, and alternatives" because of mental illness, "after the advantages and disadvantages of and alternatives to accepting a particular medication or treatment have been explained." Id. Third, the person must show "a 'substantial probability' that he or she 'needs care or treatment to prevent further disability or deterioration.'" Id., ¶22. In a recommitment, these requirements can be satisfied by either the person's treatment history or his recent acts or omissions.

¶109 Fourth, "the person must evidence a 'substantial probability that he or she will, if left untreated, lack services necessary for his or her health or safety,'" or "suffer severe mental, emotional, or physical harm that will result in the loss of the individual's ability to function independently in the

17

community or the loss of cognitive or volitional control over his or her thoughts or actions." Id., ¶¶23, 24.

¶110 The fifth criterion for dangerousness, by its terms, directs that the above requirements be evident to a "substantial probability." This is the applicable degree of proof for dangerousness under the fifth criterion set out in Wis. Stat. § 51.20(1)(a)2.e. Id., ¶26. D.J.W.'s treatment history and current actions evidence that D.J.W. meets the requirements of subd. para. 2.e. to a substantial probability thereby showing by clear and convincing evidence that he will become dangerous if his care and treatment were withdrawn.

¶111 First, there is no question that D.J.W. is seriously mentally ill, as he has been for years. Second, Dr. Coates's reports and testimony show that D.J.W. is incompetent to make medication or treatment decisions because of his mental illness. His report submitted on June 30, 2017 specifically found that D.J.W. was "INCOMPETENT to refuse medication or treatment because of mental illness." Dr. Coates said that D.J.W. "is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his . . . mental illness . . . in order to make an informed choice as to whether to accept or refuse medication or treatment."

¶112 Third, Dr. Coates explained that D.J.W. needed treatment to prevent further disability or deterioration. He said that if D.J.W. goes off treatment "[h]e's apt to have exacerbation of his illness. He's apt to experience, you know, hallucinations to a greater degree. Become delusional."

18

¶113 Fourth, Dr. Coates said that without treatment, D.J.W. "would be homeless" if his parents could no longer care for him because he is "unable to independently care for himself." Dr. Starr's report said that without treatment there is a "substantial probability" that D.J.W. "will lack the services necessary for his [] health or safety, and will suffer severe mental, emotional or physical harm that will result in loss of . . . cognitive or volitional control over [his] thoughts or actions." There can be no question that D.J.W. has an inability to control his delusions or hallucinations on his own. He has seen some recent progress, but that has been due to medication.

¶114 Based on D.J.W.'s medical record and the reports and testimony of Drs. Coates and Starr, Langlade County has met its burden to prove by clear and convincing evidence that if treatment were withdrawn, D.J.W. would be a proper subject for commitment, with dangerousness established within the parameters of Wis. Stat. § 51.20(1)(a)2.e.

### III. CONCLUSION

¶115 In conclusion, although I understand why the majority chose to evaluate the evidence that was presented under Wis. Stat. § 51.20(1)(a)2.c. and 2.d., the majority errs because the evidence fully satisfies the "fifth criterion" for dangerousness found in § 51.20(1)(a)2.e., which we carefully explained in Dennis H., 255 Wis. 2d 359. Accordingly, I respectfully dissent.

¶116 REBECCA GRASSL BRADLEY, J. *(dissenting).* Both the majority opinion and Chief Justice Roggensack's dissent reach the merits of this case. I write separately without joining either opinion because it is imprudent to reach the merits, as well as contrary to our established framework regarding the disposition of Wis. Stat. ch. 51 commitment cases that are moot. Because D.J.W. died while his case was pending in this court, we should have dismissed his appeal. D.J.W.'s death renders the case moot and a disposition unnecessary.

I

¶117 The majority acknowledges D.J.W.'s death in a footnote, see majority op., ¶26 n.5, but chooses to decide the case using as its legal basis the criminal case of State v. McDonald, 144 Wis. 2d 531, 532, 424 N.W.2d 411 (1988). Although the court in that case fully considered the rationale for reaching the merits when a criminal defendant dies with an appeal pending, see id. at 535-40, the court has never done so in the context of an appealed civil commitment. According to the majority, D.J.W.'s death "does not dictate a contrary result [to reaching the merits]." Majority op., ¶26 n.5. I disagree. The reasons for reaching the merits in a criminal case despite an intervening death do not apply in a chapter 51 commitment case.

¶118 In determining that the court should resolve a case involving a committee who dies while his appeal is pending, the majority simply asserts that "the same considerations are attendant here" as exist in a criminal matter. Id. Specifically, the majority cites significant deprivations of liberty affecting both criminal defendants and chapter 51 involuntary committees.

1

Of course, this consideration evaporates upon the death of the defendant or committee. Regardless, when the McDonald court concluded a criminal case was not moot even though the defendant died during the appellate process, it did not rely on the deprivation of his liberty as its rationale. See McDonald, 144 Wis. 2d at 532-40. Instead, the rationale was two-fold:

(1) [A] defendant has a constitutional as well as a statutory right to an appeal. This right . . . is an integral part of a defendant's right to a final determination of the merits of the case. It serves as a safeguard to protect a defendant against errors in the criminal proceedings. A defendant who dies pending appeal . . . is no less entitled to those safeguards.

(2) [B]ecause collateral proceedings may be affected by criminal proceedings in which it is alleged that an individual took the life of another, it is in the interest of society to have a complete review of the merits of the criminal proceedings.

McDonald, 144 Wis. 2d at 536-37 (emphasis added; internal citations omitted). The court identified those collateral proceedings affected by a final determination that the defendant intentionally took the life of another (the underlying crime in McDonald):

(1) "receiv[ing] money from the victim's estate under the intestacy statute";

(2) "inherit[ing] under the victim's will";

(3) "receiv[ing] any benefit from a contract in which the victim is the obligee and which names the defendant as the beneficiary";

(4) "receiv[ing] any benefit, as a beneficiary, payable as a result of the death of the victim";

(5) "receiv[ing] a benefit, as a beneficiary, from a life insurance policy on the life of the victim"; and

2

     (6) "receiv[ing] the victim's interest in property held
        in joint tenancy[.]"

Id. at 537 (internal citations omitted). The court expressly limited its analysis to criminal proceedings: "society and the deceased have a very real interest in a final determination of the defendant's appeal from the criminal conviction." Id. at 539 (emphasis added).

¶119 None of these rationales apply to an individual challenging a chapter 51 commitment. Regarding the first reason, no one has a constitutional or statutory right of appeal to the Wisconsin Supreme Court, irrespective of the nature of the case. Wis. Stat. § 809.62(1r) (2017-18)[1] ("Supreme Court review is a matter of judicial discretion, not of right[.]"); cf. Wis. S. Ct. IOP III (Sept. 13, 2019). The second rationale espoused in McDonald similarly does not apply to chapter 51 proceedings. Unlike a criminal conviction based upon an intentional killing, none of the collateral proceedings mentioned in McDonald arise from a chapter 51 commitment proceeding.[2] The absence of collateral proceedings stemming from a chapter 51 commitment

---

[1] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

[2] While it is possible D.J.W.'s estate may be liable for the cost of care he received during his commitment, see Wis. Stat. § 46.10(2) & (11)(b), this court has never concluded that costs of care alone represent a collateral consequence sufficient to render a case not moot. See Marathon Cty. v. D.K., 2020 WI 8, ¶25 n.7, 390 Wis. 2d 50, 937 N.W.2d 901 ("[W]e need not address whether the collateral consequences of costs of care under Wis. Stat. § 46.10(2)-(3) . . . would render [a commitment not moot]."); Portage Cty. v. J.W.K., 2019 WI 54, ¶28 n.11, 386 Wis. 2d 672, 927 N.W.2d 509 (not addressing whether cost of care would be a collateral consequence sufficient to render a case not moot).

proceeding erases any general societal interest in the outcome of appeals in these matters.

¶120 While valid reasons may exist in an appeal of a ch. 51 commitment to hold it is not moot despite the death of the committee while the appeal is pending, appeals from criminal convictions are fundamentally different. In order to decide whether a committee's death moots an appeal, this court should have ordered the parties to brief the issue after D.J.W.'s death. Deriving a legal basis from a criminal case is incongruous.

## II

¶121 "An issue is moot when its resolution will have no practical effect on the underlying controversy." Portage Cty. v. J.W.K., 2019 WI 54, ¶¶1, 11, 386 Wis. 2d 672, 927 N.W.2d 509 (quoted source omitted); see also Marathon Cty. v. D.K., 2020 WI 8, ¶19, 390 Wis. 2d 50, 937 N.W.2d 901 (noting the same). "Mootness is a doctrine of judicial restraint[,]" which means we refrain from resolving moot cases in the absence of a compelling reason. D.K., 390 Wis. 2d 50, ¶19. We recognize certain exceptions to this general rule and opt to address moot cases when their issues "present . . . a need for an answer that outweighs our concern for judicial economy." Waukesha Cty. v. S.L.L., 2019 WI 66, ¶15, 387 Wis. 2d 333, 929 N.W.2d 140. These include issues: (1) "of great public importance;" (2) challenging the constitutionality of a statute; (3) for which "a definitive decision is essential to guide the trial courts;" (4) "likely to arise again and [that] should be resolved by the court to avoid uncertainty;" or (5) "capable and likely of repetition and yet

evade[] review[.]" J.W.K., 386 Wis. 2d 672, ¶29 (quoting G.S. v. State, 118 Wis. 2d 803, 805, 348 N.W.2d 181 (1984)).

¶122 D.J.W.'s case is unquestionably moot because no decision issued by the court will have any effect on the controversy. Even before his death, D.J.W. was not subject to the original commitment order or the subsequent recommitment order. The firearm restriction that survives the expiration of the commitment orders ceased to have any legal effect upon D.J.W.'s death. Cf. D.K., 389 Wis. 2d 50, ¶25 (holding "a decision in [the petitioner's] favor would void the firearms ban and therefore have a 'practical effect[,]'" rendering it "not a moot issue"). When we granted review of his case, D.J.W. conceded the case was moot but asked us to exercise our discretion and review his sufficiency-of-the-evidence challenge under one of the mootness exceptions.

¶123 Because D.J.W. died, no issue outweighs our concern for judicial economy. See S.L.L., 387 Wis. 2d 333, ¶15. None of the mootness exceptions apply. The majority claims exceptions (1), (3), and (5) support reaching the merits. Majority op., ¶26 n.5 ("[T]he question of the necessary evidence to support an involuntary commitment is of great importance yet often evades appellate review. Our decision on this case will give necessary guidance to circuit courts conducting involuntary commitment proceedings."). I respectfully disagree. Chapter 51 cases are not so rare or procedurally unusual that they will evade appellate review. This term alone the court reviewed four chapter 51 cases. Two of those, the present case and D.K., 390 Wis. 2d 50, dealt with sufficiency of the evidence challenges to findings of dangerousness under Wis. Stat. § 51.20. Last term, this court

5

reviewed two chapter 51 cases, both involving sufficiency of the evidence challenges. See S.L.L., 387 Wis. 2d 333; J.W.K., 386 Wis. 2d 672. Six cases in two terms indicates appellate review is readily available to parties presenting chapter 51 cases. Admittedly, resolution of this case was of great importance to D.J.W. However, nothing about the sufficiency of the evidence in his extension hearing almost three years ago is of great public importance to overcome our customary exercise of judicial restraint.

¶124 The majority also claims a resolution will "give necessary guidance" to circuit courts. The court's only guidance commands that "circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of Wis. Stat. § 51.20(1)(a)2. on which the recommitment is based." Majority op., ¶¶3, 26 n.5, 59. This "guidance" is not new. Just this term, every member of this court detailed the importance of making specific factual findings in chapter 51 cases. D.K., 390 Wis. 2d 50, ¶55 (Ziegler, J., joined by Roggensack, C.J., and Hagedorn, JJ.) ("[The record] could have been more detailed. . . . [T]he circuit court could have made more detailed and thorough factual findings and clarified its legal conclusions. A commitment is no trivial matter. Taking more time at the circuit court can save years of uncertainty on appeal."); id., ¶68 n.4 (Rebecca Grassl Bradley, J., concurring, joined by Kelly, J.) ("Because circuit courts bear the responsibility of determining whether the evidence satisfies the statutory standard, [they] must expressly make independent factual findings on the record, separate from any legal conclusions. Merely reciting testimony or

6

melding factual findings with legal conclusions can constrain appellate review. Because appellate courts overturn only factual findings that are 'clearly erroneous,' there must be distinct separation of factfinding from legal conclusions." (citation omitted)); id., ¶¶86, 79 n.2 (Dallet, J., dissenting, joined by Ann Walsh Bradley, J.) ("[Wis. Stat. ch. 51] hearings cannot be perfunctory under the law. Attention to detail is important." (quoted source omitted); "[T]he circuit court's factual findings in this case are scant[.]").

¶125 The court has already emphasized that circuit courts must make explicit factual findings on the record to support their legal conclusions in Chapter 51 cases. Regardless of the nature of the proceeding, a circuit court must always state the facts upon which it bases its legal conclusions. "In all matters tried before a court, the trial court must make findings of ultimate facts upon which the judgment of the court rests. Adequate findings must be made in order to protect the rights of litigants and to facilitate review of the record by an appellate court." Termination of Parental Rights of T.R.M., 100 Wis. 2d 681, 687, 303 N.W.2d 581 (1981) (internal footnote omitted); see also Wis. Stat. § 805.17(2) ("In all actions tried upon the facts without a jury . . . the court shall find the ultimate facts and state separately its conclusions of law thereon.").

¶126 The woefully inadequate record in this case also militates against deciding the merits. See majority op., ¶¶36-40, 47 (discussing no consistent statutory basis for the initial commitment, changing arguments by the County, "conflicting messages" by the County and lower courts, and an erroneous standard

7

of review by the court of appeals). Particularly in light of a record that is "quite unhelpful in guiding this court's analysis[,]" the court should dismiss this case as moot. D.J.W.'s death eliminates any otherwise applicable mootness exceptions.

### III

¶127 Given D.J.W.'s death, there is no reason for the court to reach the merits. Resolution of the disputed issue has no "practical effect" on the underlying sufficiency-of-the-evidence challenge D.J.W. raised. This fact-specific challenge is of no importance to the general public, these challenges commonly receive our discretionary review, and the little guidance provided by the court does not outweigh the overriding interest in judicial economy. The majority declines to dismiss this case and instead analogizes chapter 51 appeals to criminal appeals in its mootness analysis, without acknowledging the differences between the two. Neither the language nor rationale of McDonald supports reaching the merits in a chapter 51 case when the committee dies during the appeal. This case is moot, no exception applies, and the case should be dismissed.