COURT OF APPEALS
DECISION
DATED AND FILED

November 24, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.      **2021AP1291-FT**

Cir. Ct. No.  **2017ME104**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT IV**

IN THE MATTER OF THE CONDITION OF C. K. S.:

PORTAGE COUNTY,

    PETITIONER-RESPONDENT,

  V.

C. K. S.,

    RESPONDENT-APPELLANT.

          APPEAL from an order of the circuit court for Portage County: ROBERT J. SHANNON, Judge. *Reversed.*

¶1 NASHOLD, J.[1] C.K.S. appeals from an order extending his WIS. STAT. ch. 51 commitment. C.K.S. argues that there was insufficient evidence of current dangerousness to justify recommitment. He further argues that reversal is warranted because the circuit court failed to specify the statutory basis for recommitment, as required by *Langlade County v. D.J.W.*, 2020 WI 41, ¶40, 391 Wis. 2d 231, 942 N.W.2d 277. I conclude that Portage County failed to establish, by clear and convincing evidence, that C.K.S. is dangerous under any statutory standard. *See* WIS. STAT. § 51.20(1)(a)2., (13)(e). Accordingly, I reverse on that basis, without addressing whether the circuit court complied with *D.J.W.* or what the proper remedy would be if the court did not do so.[2] *See Turner v. Taylor*, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (court need not address all issues raised by the parties if one issue is dispositive).

## BACKGROUND

¶2 C.K.S. was initially committed in 2017, following an incident in which he brandished a knife and threatened suicide by medication overdose. It appears that C.K.S. has since remained under continuous WIS. STAT. ch. 51 commitment. In February 2021, the County petitioned for a twelve-month extension of C.K.S.'s most recent order. At that time, C.K.S. was thirty years old,

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20). In an August 25, 2021 order, the court placed this case on the expedited appeals calendar, and the parties have submitted memo briefs. *See* WIS. STAT. RULE 809.17. Briefing was complete on October 26, 2021. All references to the Wisconsin Statutes are to the 2019-20 version.

[2] One day after C.K.S. filed his brief-in-chief, our supreme court granted the petition for review in *Sheboygan County v. M.W.*, No. 2021AP6, unpublished slip op. (WI App May 12, 2021). The petition for review addresses the appropriate remedy for the circuit court's failure to comply with the directive of *Langlade County v. D.J.W.*, 2020 WI 41, ¶40, 391 Wis. 2d 231, 942 N.W.2d 277.

committed on an outpatient basis, and residing in a community-based residential facility, which for ease of reading I refer to as a group home.

¶3    In March 2021, the circuit court held C.K.S.'s extension hearing, at which two witnesses testified. The first witness, Dr. Jeffrey Marcus, was the court-appointed examiner. Marcus reviewed C.K.S.'s medical records and met with him for a video examination. Marcus testified that C.K.S. has "either schizophrenia or schizoaffective disorder" and "a substance abuse disorder which appears to be in remission." Marcus identified the primary symptoms of C.K.S.'s mental illness as "delusions, auditory hallucinations where he hears voices, [and] what we call negative symptoms or deficit symptoms that impair a person's ability to exercise judgment, planning ability, insight and the like, and thought disorganization." Marcus testified that C.K.S. has a treatable condition that can be improved or controlled by the medications C.K.S. takes for his symptoms. Based on his review of C.K.S.'s medical records, Marcus believed that C.K.S. "has done better since receiving medication."

¶4    Marcus recommended that C.K.S.'s commitment be extended and that C.K.S. remain living in his group home. Marcus explained that C.K.S. "needs the supports and the structure provided by" the group home, "[a]nd then they would also arrange for his psychiatric care in that type of setting." According to Marcus, there was "a substantial likelihood, based on the record, that [C.K.S.] would be a proper subject for commitment if treatment were withdrawn." Marcus explained, "My concern and the reason I believe that is that … if [C.K.S.'s] commitment were withdrawn, he would not follow through with his medication. He would continue substance use, and his symptoms would worsen, and he would become a danger to himself or others." Marcus testified that his "understanding" was that C.K.S. "has [not] always been compliant under commitment," and "that is

the chief reason that commitment is being petitioned." When asked if C.K.S. would "be a danger to himself as well as others" if he were "not under commitment and symptoms were to return," Marcus responded,

> That is my concern. The primary issues would be a recurrence of suicidal ideation. It would be an issue where he would not be able to satisfy his basic care needs, where he couldn't take care of himself, and where he would exercise very poor judgment. Those would be the chief concerns to his health and safety.

Marcus further testified, "[I]f [C.K.S.] were to withdraw from treatment, his ability to satisfy his basic care needs has [sic] historically declined." Marcus testified, however, that this was not a "concern … at present. I'm not aware that this is an issue at present." Marcus described C.K.S. generally as "doing quite well."

¶5 Although Marcus testified that C.K.S. "would not follow through with his medication" without a commitment order, he testified that he was not recommending a medication order because C.K.S. "acknowledges that he did have" a mental illness and "acknowledge[s] … that he has a condition for which the medications have offered benefit." In Marcus's opinion, C.K.S. had "moderate" "insight … when discussing his mental illness and benefits to treatment."

¶6 Marcus's report, which was entered into evidence, provides further details about C.K.S.'s diagnosis, past and present symptoms, and behavior:

> The subject has a history of schizophrenia/ schizoaffective disorder with numerous psychiatric hospitalizations in the past. He has a history of benefitting from psychotropic treatment, but has had significant residual symptomatology, including poor judgment and persistent deficit symptoms. His mental illness has been disabling. Chronic delusional ideation of a religious,

4

paranoid, and grandiose nature was described in the records. The intensity of his psychotic symptoms appears improved when adherent to treatment. The subject has benefited from the structure of group home settings in order to ensure consistent medication adherence and lack of access to addictive substances. He has exhibited periods of agitation, yelling, and property destruction in previous placements.

The subject has a history of substance abuse, including misuse of prescription opiate medications. His substance use disorder has been in forced remission within a controlled environment.

¶7 In addition, Marcus's report contains more information about how, in Marcus's opinion, C.K.S. would decompensate without treatment:

There is a substantial likelihood of psychotic decompensation if current treatment were withdrawn. This would result in an increased risk of dangerousness to self and others. Of specific concern would be the emergence of erratic, impulsive, and unsafe behaviors associated with acute psychotic symptomology. He has a history of displaying highly agitated and disorganized behaviors when symptomatic. Associated with this has been acute suicidality and gross impairment of functioning. There is a concern that the subject would be unable to satisfy his basic care requirements if he were to withdraw from treatment. His overall risk of dangerousness has declined with his current treatment.

¶8 The report further discusses C.K.S.'s compliance with, and opinions about, his medications, lending support to Marcus's conclusion that a medication order was unnecessary:

The subject stated that he has been feeling well recently. He described his mood as "pretty good." He acknowledged having a diagnosis of schizoaffective disorder and claimed that his current medications were offering benefit. He was somewhat familiar with the Latuda, claiming that it has offered benefit with auditory hallucinations…. He stated that the intensity of the voices appears less with his current treatment…. He stated that he used to be preoccupied with "religious" thoughts and was "afraid for the world," but denied any recent fears or preoccupying thoughts. He denied suicidal or homicidal

5

ideation or intent. He claimed to be tolerating his psychotropic medications well. He endorsed a history of weight gain from psychotropic medications. He was of the opinion that his hallucinations would worsen if he were to discontinue his medications….

….

The subject appeared capable of expressing a general understanding of his psychotropic treatment. He expressed familiarity with his current medications and appeared aware of potential side effects of his treatment.

The subject demonstrated partial insight into the presence and nature of his mental illness. He acknowledged receiving benefit from his medications and expressed an interest in maintaining his current treatment.

¶9     Heather Grassl, C.K.S.'s social worker, also testified. Grassl explained that she had worked with C.K.S. since he had been under commitment. The County asked Grassl about "times where [C.K.S.] was not compliant with his commitment or … where he has not been compliant with medication or he has been dangerous." She responded, "There ha[ve] been times over the course of the commitment where he has used either a prescription medication from other people in the group home that he's obtained or he has drank alcohol which has grossly impaired his functioning." Grassl pointed to two problematic incidents. In one, C.K.S. was on "a very brief pass from his previous [group home] placement, and he went to a local gas station … and drank an undetermined amount of alcohol, [and] returned back to the group home quite intoxicated." Grassl testified that drinking alcohol was "against the group home policy." Grassl also testified that this incident occurred in February 2020 and that C.K.S. "wasn't dressed properly. There were concerns for his safety … being out in the elements impaired." The second incident, about two months before the hearing, involved C.K.S.'s receiving THC cartridges in the mail and testing positive for THC. Grassl testified that

C.K.S.'s need for "daily prompting" could be fulfilled by a family member; however, "the recommendation is 24 hour[] supervision at this point."

¶10     Grassl further testified that she did "not believe" that C.K.S. would be able to care for himself if he were released back into the community because "[h]e, in collaboration with both him and in-home staff, on a regular basis he still continues [to need] daily prompting as far as daily cares, structure, medication monitoring, programming."     When asked specifically whether C.K.S. would continue treatment if not under commitment, Grassl responded, "Uncertain," explaining, "I believe he needs daily structure."  Grassl testified that C.K.S. could not remain at the group home or continue programming through the same health center if he were not under a commitment order.

¶11     The circuit court determined that C.K.S. was mentally ill, a proper subject for treatment, and would be a danger to himself if treatment were withdrawn.  In so concluding, the court relied on Marcus's opinions, which the court summarized as follows: "there is a substantial likelihood of psychotic decompensation if current treatment [were] withdrawn";  that "decompensation would consist most likely of [a] return to acute psychotic symptoms, including the same or similar erratic, impulsive and unsafe behaviors and suicidal ideations which were exhibited prior to treatment commencement"; and that "in such a state, [C.K.S.] would be unable to satisfy or attend [to] his basic needs[,] which would endanger his physical and mental health and likely [lead to the] return of the suicidal ideations and use of nonprescribed controlled substances as has occurred in the past."

¶12     The court found, however, that C.K.S. "has the ability to recognize the benefits and necessity of his treatment programming, including the medication

therapy, and has expressed an interest and the intention to continue it." Accordingly, the court entered a twelve-month order committing C.K.S. to outpatient treatment with conditions, without a corresponding medication order. C.K.S. appeals.

## DISCUSSION

*Principles of Law and Standards of Review*

¶13    A county initiating a WIS. STAT. ch. 51 involuntary commitment must prove, by clear and convincing evidence, that the subject individual is: (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous under one of five statutory standards, as set forth in WIS. STAT. § 51.20(1)(a)2.a.-e.  *Portage County v. J.W.K.*, 2019 WI 54, ¶17, 386 Wis. 2d 672, 927 N.W.2d 509; § 51.20(1)(a), (13)(e).  Each of these "dangerousness" standards requires evidence of recent acts or omissions demonstrating a substantial probability of danger to the individual or to others—either because the individual will directly cause injury or because the individual cannot satisfy his or her basic needs.  *Winnebago County v. S.H.*, 2020 WI App 46, ¶8, 393 Wis. 2d 511, 947 N.W.2d 761; § 51.20(1)(a)2.a.-e.

¶14    An extension proceeding requires proof of the same three elements, "except that instead of proving dangerousness under [WIS. STAT.] § 51.20(1)(a)2.a.-e., the county may rely on the 'alternative evidentiary path' of § 51.20(1)(am)."  *S.H.*, 393 Wis. 2d 511, ¶8 (quoting *J.W.K.*, 386 Wis. 2d 672, ¶19); § 51.20(13)(g)3.  Paragraph (am) "recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior."  *J.W.K.*, 386 Wis. 2d 672, ¶19.  Accordingly, the county need not point to any recent

problematic acts, omissions, or behavior, and may instead "show[] that there is a substantial likelihood, based on the subject individual's treatment record, that the individual *would be a proper subject for commitment* if treatment were withdrawn." Sec. 51.20(1)(am) (emphasis added). Importantly, "[i]t is not enough that the individual was at one point a proper subject for commitment"—rather, "[e]ach extension hearing requires proof of *current* dangerousness" by clear and convincing evidence. ***J.W.K.***, 386 Wis. 2d 672, ¶24.

¶15    Review of an extension order presents a mixed question of fact and law. ***S.H.***, 393 Wis. 2d 511, ¶10. The appellate court upholds factual findings unless clearly erroneous, but it reviews de novo whether those facts satisfy the statutory standard for recommitment. ***Id.***

*Application to C.K.S.'s Appeal*

¶16    The circuit court did not identify which of the five standards under WIS. STAT. § 51.20(1)(a)2. supported its conclusion that C.K.S. is dangerous. The hearing testimony and Marcus's report concern the potential danger C.K.S. poses to himself (as opposed to others) because of his suicidal ideation, substance use, and inability to care for himself. Accordingly, there are three potential statutory grounds for the circuit court's conclusion that C.K.S. is dangerous: § 51.20(1)(a)2.a., c., and d. I will apply each standard to the facts of this case.

¶17    At the outset, however, I emphasize that the circuit court found, and the record reflects, that C.K.S. "has the ability to recognize the benefits and necessity of his treatment programming, including [his] medication therapy, and

has expressed an interest [in] and the intention to continue it."[3] Also, as Marcus noted in recommending that the court *not* order involuntary medication, C.K.S. acknowledged that he has a mental illness and that he "has a condition for which medications have offered benefit." Therefore, this is not a case in which the subject individual is by all accounts *unwilling* to follow a treatment regimen that manages symptoms and, ultimately, reduces or eliminates dangerous behaviors. Accordingly, it cannot simply be inferred that C.K.S. will return to his (potentially dangerous) pre-treatment state without a commitment order. Instead, the evidence must show that there is "a substantial likelihood" that C.K.S. "would be a proper subject for commitment if treatment were withdrawn," *see* WIS. STAT. § 51.20(1)(am), because a "substantial probability" of physical harm to C.K.S. would then follow, *see* § 51.20(1)(a)2.a., c., d. Importantly, a "substantial probability" means that the harm "is much more likely than not." ***Marathon County v. D.K.***, 2020 WI 8, ¶35, 390 Wis. 2d 50, 937 N.W.2d 901.

---

[3] In making this finding, the circuit court appears to have resolved somewhat contradictory evidence as to whether C.K.S. would continue his medication without a court order. Specifically, as discussed above, Marcus opined that C.K.S. "would not follow through with his medication" if treatment were withdrawn, but he also testified that C.K.S. understood his mental illness and "acknowledge[d] … that he has a condition for which medications have offered benefit." Relatedly, Marcus testified that C.K.S. "has [not] always been compliant under commitment," but it is unclear, based on the entirely of the transcript, whether this statement was specifically in reference to *medication* compliance (as opposed, say, to C.K.S.'s compliance with rules prohibiting drug and alcohol use). Marcus's report, which is also in evidence, states that C.K.S. "acknowledged receiving benefit from his medications and expressed an interest in maintaining his current treatment." Grassl, for her part, stated that it was "[u]ncertain" whether C.K.S. would continue treatment without a court order, but she did not specifically testify to C.K.S.'s likely or potential medication adherence. In the end, the circuit court found that C.K.S. "has the ability to recognize the benefits and necessity of his treatment programming, including the medication therapy, and has expressed an interest and the intention to continue it." This factual finding is supported by the evidence, and thus is not clearly erroneous. Accordingly, this decision proceeds from the premise that C.K.S. understands that he has a mental illness and is willing to continue his medication on his own initiative.

<u>The County did not establish, by clear and convincing evidence, that C.K.S. is currently dangerous under WIS. STAT. § 51.20(1)(a)2.a.</u>

¶18    Under WIS. STAT. § 51.20(1)(a)(2)a., an individual is currently dangerous because he or she "[e]vidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm."    Phrased in the context of a *re*commitment, an individual is currently dangerous under subd. para. a. because, if treatment were withdrawn, § 51.20(1)(am), a substantial probability of threatened or attempted suicide or serious bodily harm would result, § 51.20(1)(a)2.a.  *Cf. **D.J.W.**,* 391 Wis. 2d 231, ¶¶50, 56 (setting forth the standard for analyzing dangerousness under subd. paras. d. and c., respectively, "through the lens of" the recommitment standard of § 51.20(1)(am)).[4]

¶19    In arguing that C.K.S. would likely become suicidal without a commitment order, the County points to Marcus's prediction of decompensation. As stated, Marcus testified that "there is a substantial likelihood of psychotic decompensation if current treatment were withdrawn" and that, if C.K.S. were "not under commitment and symptoms were to return," the "concern" or one "primary issue[] would be a recurrence of suicidal ideation."  Marcus, however, provided almost no details about why he believed decompensation would be "substantially likely" to occur without a commitment order.  *See* WIS. STAT.

---

[4] Although not articulated in ***D.J.W.***, 391 Wis. 2d 231, ¶¶50, 56, this standard also embodies the requirement that there be "a substantial likelihood, based on the subject individual's treatment record," that the individual would again become "a proper subject for commitment," WIS. STAT. § 51.20(1)(am), such that there would then exist a "substantial probability of physical harm" to the subject individual, § 51.20(1)(a).2.a.  Thus, there must be a "substantial likelihood" of reversion or decompensation to a state in which there then existed a "substantial probability" of harm or injury.

§ 51.20(1)(am). Moreover, he offered *no* testimony or opinion that there is a "substantial probability" that C.K.S. would threaten or attempt suicide or serious bodily harm as a result. *See* § 51.20(1)(a)2.a. A conditional statement about a "concern" or "issue" if symptoms "were to return" does *not* demonstrate that suicidal thoughts (much less overt suicidal acts) are "much more likely than not" without a commitment order. *See D.K.*, 390 Wis. 2d 50, ¶35. In fact, Marcus's only statement about how a commitment order might prevent decompensation (and thus, ultimately, suicidal acts or threats) is one sentence in his report, which states, "The subject has benefited from the structure of group home settings in order to ensure consistent medication adherence and lack of access to addictive substances." This statement, however, does not indicate that C.K.S. would *not* adhere to medication without a commitment order—it merely shows that residence in his group home is beneficial in this regard (as discussed above, other evidence shows that C.K.S.'s medication helps prevent suicidal ideation). The circuit court did not find, and it is speculative to simply assume, that *only* court-ordered treatment provides the type of "structure" C.K.S. requires to remain medication compliant.

¶20 The County relies on *S.H.* for the proposition that (in the County's words) a commitment order may be based on "precommitment behavior and [on] the doctor's opinion that without treatment [the subject individual] would decompensate and require recommitment." *See S.H.*, 393 Wis. 2d 511, ¶13 ("Dangerousness in an extension proceeding can and often must be based on the individual's precommitment behavior, coupled with an expert's informed opinions and predictions (provided, of course, that there is a proper foundation for the latter)."). But rather than advancing the County's position, *S.H.* cuts against it. This statement in *S.H.* merely acknowledges that, under the recommitment

standard, an individual "may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior." *J.W.K.*, 386 Wis. 2d 672, ¶19. Accordingly, an expert may, and sometimes must, demonstrate dangerousness indirectly. *S.H.*, 393 Wis. 2d 511, ¶13. *S.H.* does not, however, countenance an extension order based on conclusory predictions unsupported by underlying evidence, without any showing either as to why decompensation is "substantially likely" to occur or that a "substantial probability" of physical harm would then result. *See* WIS. STAT. § 51.20(1)(a)2., (1)(am); *S.H.*, 393 Wis. 2d 511, ¶13 (noting that the lack of evidence supporting the legal conclusion of dangerousness will render the expert's testimony insufficient).

¶21 If the County means to argue that *S.H.* controls because the facts of that case are analogous, then the County is incorrect. In fact, this court affirmed the commitment order in *S.H.* because of some key facts *not* present here. Specifically, S.H., a committed individual diagnosed with paranoid schizophrenia, did not believe that she was mentally ill and did not believe that she needed medication. *Id.*, ¶¶3, 4, 15. S.H. thus had a history of "'go[ing] off medications' when not involuntarily committed, leading to 'hospitalizations and further commitment.'" *Id.*, ¶¶4, 15. Because of this history (as testified to by S.H.'s treating physician), the circuit court implicitly determined that there was "a 'very high likelihood' that [S.H.] would again discontinue medication without a commitment order." *Id.*, ¶15. Moreover, there was evidence in *S.H.* that the medication prevented dangerous behavior. For example, the physician testified that a change in medication caused "paranoid ideation" and S.H.'s "br[inging] a baseball bat to work," the implication being that S.H. may have intended to threaten or hurt somebody with the baseball bat. *Id.* Therefore, the physician's testimony "'connected the dots,' supporting the court's final determination that

[S.H.] would repeat this cycle (end of commitment/going off medication/dangerous behavior/recommitment) if her commitment order were not extended." *Id.*

¶22 Again, and in contrast, the testimony here does not "connect the dots." That is, Marcus did not explain why the "end of commitment" would lead to C.K.S.'s "going off medication," why the "end of commitment" would otherwise result in "dangerous behavior," or why suicidal behavior was "much more likely than not" to result. *See id.*; *see also* **D.K.**, 390 Wis. 2d 50, ¶35 ("substantial probability" means "much more likely than not"). Rather, the evidence shows that C.K.S. threatened suicide when he was initially committed in 2017. In an extension proceeding, however, "[i]t is not enough that the individual was at one point dangerous"—there must be sufficient evidence of *current* dangerousness. **D.J.W.**, 391 Wis. 2d 231, ¶34. In sum, the County did not show, by clear and convincing evidence, that C.K.S. meets the dangerousness standard of WIS. STAT. § 51.20(1)(a)2.a.

The County did not establish, by clear and convincing evidence, that C.K.S. is currently dangerous under WIS. STAT. § 51.20(1)(a)2.c.

¶23 As pertinent here, WIS. STAT. § 51.20(1)(a)2.c., "in combination with para. (1)(am), provides that 'dangerousness' in a recommitment can be shown if a person would "[e]vidence[] such impaired judgment … that there is a substantial probability of physical impairment or injury to himself …' if treatment were withdrawn." **D.J.W.**, 391 Wis. 2d 231, ¶56 (alterations in original). Here, evidence relating to "impaired judgment" could potentially include Marcus's statements in his report that C.K.S. "has exhibited periods of agitation, yelling, and property destruction in previous placements" and that C.K.S. has a substance use disorder that is in "forced remission" by virtue of his being under

14

commitment. In addition, Grassl testified that, on two occasions approximately thirteen and eleven months before the recommitment hearing, C.K.S. used substances, the first time drinking enough alcohol to become "grossly impaired" and the second time testing positive for THC. According to Grassl, the time C.K.S. drank alcohol, he also "wasn't dressed properly" for the winter weather.

¶24    But the record does not demonstrate that, if treatment were withdrawn, C.K.S. would have "such impaired judgment" that there would exist a "substantial probability of physical impairment or injury to" C.K.S. *See* WIS. STAT. § 51.20(1)(a)2.c. Testimony that C.K.S. did not dress "properly" for winter does not establish a "substantial probability" that C.K.S. was in danger of physical impairment or injury on that occasion. Notably, there are no additional details indicating that C.K.S. could have been harmed because of his intoxication or manner of dress. For example, there was no evidence about what C.K.S. was wearing, what the temperature was, or how long he was outside. Nor do the facts that C.K.S. has a substance use disorder, and used substances on two occasions, indicate that "a substantial probability of physical impairment or injury" would occur without a commitment order, *see id.*—i.e., that this danger would be "much more likely than not," *D.K.*, 390 Wis. 2d 50, ¶35. Accordingly, subd. para. c. does not support a finding of current dangerousness.

The County did not establish, by clear and convincing evidence, that C.K.S. is currently dangerous under WIS. STAT. § 51.20(1)(a)2.d.

¶25    Evidence "meets the standard for dangerousness set by WIS. STAT. § 51.20(1)(a)2.d., as viewed through the lens of § 51.20(1)(am)," where there is "sufficient evidence to support the conclusion that [C.K.S.] would be 'unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious

physical injury, serious physical, serious physical debilitation, or serious physical disease will imminently ensue[,]' § 51.20(1)(a)2.d., if treatment were withdrawn." *See D.J.W.*, 391 Wis. 2d 231, ¶50 (second alteration in original).

¶26    To the extent the County suggests that dangerousness under this standard is established by evidence of the two occasions in which C.K.S. used alcohol or THC, I reject this argument. As discussed above, Grassl's testimony concerning these incidents does not show that, if treatment were withdrawn, C.K.S.'s substance use would manifest as an inability "to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment." *See* WIS. STAT. § 51.20(1)(a)2.d. Similarly, the testimony does not show "that a substantial probability exists that death, serious physical injury, serious physical, serious physical debilitation, or serious physical disease [would] imminently ensue" as a result. *See id.*

¶27    Nor does the other evidence satisfy this standard. The record reflects that C.K.S.'s commitment order enables him to live in his group home and receive coordinated mental health treatment between the group home and his health care center. Furthermore, Grassl testified that the group home gives C.K.S. "daily structure" and "daily prompting as far as daily cares, structure, medication monitoring, programming." Grassl acknowledged that a family member could provide "daily prompting" but also testified that C.K.S. needed "24 hour[] supervision." Grassl, moreover, was "[u]ncertain" that C.K.S. would continue treatment without "daily structure."

¶28    For several reasons, this evidence does not establish that C.K.S. is currently dangerous under WIS. STAT. § 51.20(1)(a)2.d. Grassl did not provide any details as to how group home supervision helps C.K.S. satisfy his basic needs,

and she did not testify that C.K.S. would be *unable* to satisfy his basic needs *without* daily prompting and supervision. Notably, as discussed above, there was no specific testimony, and the circuit court did not find, that C.K.S. needs "daily prompting" to remain medication-compliant. Nor is there sufficient evidence that the group home (or the commitment order in some other respect) prevents "a substantial probability [of] death, serious physical injury, serious physical debilitation, or serious physical disease [that would] imminently ensue" from C.K.S.'s inability to care for himself.[5]

¶29    Thus, the evidence suggests that the commitment order is *helpful* to C.K.S. But the standard under WIS. STAT. § 51.20(1)(a)2.d. is much more rigorous: the individual must be unable to satisfy his own needs, and his inability to do so must represent a substantial probability of serious and imminent physical harm. *See* WIS. STAT. § 51.20(1)(a)2.d.; *see also **D.J.W.***, 391 Wis. 2d 231, ¶53 ("Inability to care for oneself does not equate with a 'substantial probability' that 'death serious physical injury, serious physical debilitation, or serious physical disease' would ensure if treatment were withdrawn."). Accordingly, the County

---

[5] Marcus was asked if C.K.S. would "be a danger to himself as well as others" if he were "not under commitment and symptoms were to return," and he responded, "That is my concern. The primary issues would be a recurrence of suicidal ideation. It would be an issue where he would not be able to satisfy his basic care needs." To the extent this statement was meant to convey that C.K.S.'s suicidal ideation manifests as, or results in, an inability to satisfy his basic needs, there is no additional evidence supporting this prediction. Marcus further testified, "If [C.K.S.] were to withdraw from treatment, his ability to satisfy his basic care needs has [sic] historically declined." There is no other evidence, however, indicating when or how C.K.S. has "historically declined"; rather, the record appears to reflect that C.K.S. has been under commitment since 2017, and has been medication-compliant during that time. As discussed above, there must be evidence "connect[ing] the dots" or supporting the circuit court's ultimate conclusion that an individual would again require recommitment if treatment were withdrawn. ***S.H.***, 393 Wis. 2d 511, ¶13.

failed to establish, by clear and convincing evidence, that C.K.S. is dangerous under § 51.20(1)(a)2.d.

## CONCLUSION

¶30 For the reasons stated, the County did not meet its burden of proving, by clear and convincing evidence, that C.K.S. is dangerous under any statutory standard. *See* WIS. STAT. § 51.20(1)(a)2., (13)(e). Accordingly, the recommitment order is reversed.

*By the Court.*—Order reversed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.