COURT OF APPEALS
DECISION
DATED AND FILED

December 7, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2021AP898**

**STATE OF WISCONSIN**

Cir. Ct. No.  2020ME305

**IN COURT OF APPEALS
DISTRICT III**

IN THE MATTER OF THE MENTAL COMMITMENT OF **J. A. E.**:

**MARATHON COUNTY,**

    **PETITIONER-RESPONDENT,**

  **V.**

**J. A. E.,**

    **RESPONDENT-APPELLANT.**

---

APPEAL from orders of the circuit court for Marathon County: SUZANNE C. O'NEILL, Judge. *Affirmed*.

¶1    GILL, J.[1]  James[2] appeals from orders for his commitment and involuntary medication and treatment, both entered pursuant to WIS. STAT. ch. 51.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

James argues that Marathon County ("the County") failed to establish that he was dangerous pursuant to WIS. STAT. § 51.20(1)(a)2. We conclude that the evidence supports the circuit court's conclusion that James is dangerous. Accordingly, we affirm.

## BACKGROUND

¶2     In November 2020, a Medford, Wisconsin, police officer completed a statement of emergency detention alleging that James was showing signs of being detached from reality, including having paranoia so severe that his ability to make decisions was impaired. The statement further indicated that James's paranoia put his safety in question.

¶3     After a hearing, the Taylor County Circuit Court found probable cause to believe that James was mentally ill, a proper subject for treatment, and dangerous to himself or others. The court entered an order pursuant to WIS. STAT. § 51.20(8)(b) detaining James at the hospital until a final hearing. Prior to the hearing, the court appointed Drs. Marshall Bales and John Coates to examine James. Both doctors prepared reports setting forth the results of their evaluations. The court also ordered that venue be changed to Marathon County based upon the motion of Taylor County Corporation Counsel.

¶4     A final commitment hearing was held in the Marathon County Circuit Court on December 4, 2020, at which both Bales and Coates testified in support of James's commitment. Bales testified that James was clearly psychotic

---

[2] For ease of reading, we refer to the appellant in this confidential matter using a pseudonym, rather than his initials.

during his evaluation. According to Bales, James explained that he heard three loud voices and that medication was not necessary because the voices were real. Bales noted that James seemed to enjoy the voices he heard. Bales further testified that James was defensive, not reality based, irritable, paranoid, and antagonistic. Bales also indicated that James was in denial of the gravity of his illness and lacked the ability to comprehend his need for treatment.

¶5     Bales further stated that James was "so psychotic, he is so detached from reality, and he is so defensive internally and oppositional about getting the help he needs on a voluntary basis" as to create a danger to "[m]ainly himself." James's history of failing to follow through with voluntary treatment formed an important part of Bales's opinion. Based upon his evaluation of James, the active psychosis he personally observed, and the hallucinations James admitted, Bales opined that James's judgment was impaired and that his impaired judgment rendered James unable to care for himself.

¶6     It was Bales's further opinion that James suffered from schizophrenia. Bales confirmed that schizophrenia was a mental illness that, in James's case, would be treatable through psychiatric care and medications. Bales further opined that James needed an order for involuntary medication or treatment due to his inability to apply information about medication or treatment to his own condition.

¶7     During cross-examination, Bales noted that James did contact mental health crisis professionals in August, September, and October of 2020 for voluntary treatment. Nonetheless, Bales explained that despite his contact with these individuals, James continued to use "meth here and there" and refused to follow the recommendations made to him by crisis professionals.

¶8  Coates testified that during his examination of James, James admitted that he was hospitalized after getting into a "psychosis state." James also acknowledged that he was very anxious and again said he was constantly hearing voices, identifying them as "three distinct different people who claim that they can hear his thought patterns through the use of electromagnetic force signals." James denied having a mental illness, but he did report a lengthy history of hospitalizations at a mental health institution. James also did not believe psychotropic medications were of any value. James admitted to using methamphetamine.

¶9  Coates further testified that when he examined James, he found James's thought process to be illogical and that James suffered from bizarre and paranoid delusions. Coates noted James experienced ongoing auditory hallucinations and that he exhibited some obsessive-compulsive traits. Coates further noted that James had limited abstract thinking ability, was unable to perform simple calculations, and that his judgment was impaired. Like Bales, Coates diagnosed James with schizophrenia, paranoid type, and opined that James's illness was treatable with psychotropic medication.

¶10  Coates further opined that James presented a substantial probability of danger to himself and others. Coates explained that James had a psychotic illness with "unpredictable" behavior that can be impulsive and dangerous, creating uncertainty as to what "[James] might do." In addition, Coates noted that James experienced paranoid delusions about his mother's boyfriend and that James was carrying a knife as a result of these delusions. Coates stated that James's ongoing methamphetamine use "can cause psychosis in and of itself" and contributed to his dangerousness because it will inhibit successful treatment. In addition, Coates testified that when James is in a psychotic state, he is unable to

properly care for himself. Coates further testified that James was not competent to refuse medication because James could not understand the advantages and disadvantages of medication, and because James did not believe that he was mentally ill.

¶11 The circuit court found that James was a proper subject for commitment as he had a treatable mental illness: paranoid schizophrenia. Based upon the testimony of Bales and Coates, the court specifically found that James was dangerous because James "has judgment so impaired that there is a substantial probability that exists of physical impairment or injury to himself or others, as manifested by a pattern of recent acts or omissions." The court further found that the doctors' testimony about the "consistency of the mental illness, [and James's] efforts of obtaining treatment, and not following through on treatment" evidenced a pattern of conduct, which showed a substantial probability that James "would not be able to appropriately care for himself and place himself in danger or danger of others." In finding James dangerous, the court also noted the testimony of both doctors that James

> is in denial of his mental health diagnoses, that he is in denial of the need to take medications, that his conduct does exude that he suffers from hallucinations, that he is paranoid, that his conduct is unpredictable and could be impulsive, that there is evidence that at a time [James] did possess a knife while suffering from this mental illness, [and] that there is a reasonable inference that the Court could make with regard to the fact that he was in possession of a knife while untreated for his schizophrenia, while suffering from paranoia and experiencing hallucinations.

¶12 The circuit court entered an order committing James for six months and an order for involuntary medication and treatment during the period of his commitment. James was told he could not possess a firearm and was required to

5

forfeit any firearms in his possession. James now appeals from the original orders for commitment and involuntary medication and treatment entered on December 4, 2020.[3]

## DISCUSSION

¶13    James argues that the County failed to prove that he was dangerous to himself or others under WIS. STAT. § 51.20(1)(a)2. In response, the County first argues that James's appeal is moot because the initial commitment order at issue has expired. The County asserts that invalidating it would have no "practical effect" on James's status, as James is now subject to a recommitment order with identical collateral consequences.

¶14    We generally do not consider moot issues. *State ex rel. Olson v. Litscher*, 2000 WI App 61, ¶3, 233 Wis. 2d 685, 608 N.W.2d 425. An issue is moot when its resolution will have no practical effect on the underlying controversy. *Id.* We need not resolve this issue, however, because we conclude that regardless of whether James's appeal is moot, there is sufficient evidence to support the circuit court's dangerousness finding. An appellate court need not address every issue raised by the parties when one issue is dispositive. *Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013). Therefore, regardless of whether James's appeal is moot, we elect to address his arguments on their merits.

---

[3] James's commitment was extended for one year on June 2, 2021. That extension was accompanied by an order for involuntary medication and treatment.

¶15     Turning to the merits, in a WIS. STAT. ch. 51 proceeding, a petitioner has the burden to prove by clear and convincing evidence that a subject individual is mentally ill, a proper subject for treatment, and dangerous to himself or herself, or to others. *See* WIS. STAT. § 51.20(1)(a), (13)(e). Whether this burden has been met presents a mixed question of law and fact. ***Waukesha Cnty. v. J.W.J.***, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. We will uphold the circuit court's findings of fact unless they are clearly erroneous. ***Id.*** Whether these findings satisfy the statutory standards is a question of law we review de novo. ***Id.*** James does not challenge that he is mentally ill and a proper subject for treatment. Rather, his appeal focuses on whether the County established that he was dangerous pursuant to § 51.20(1)(a)2.

¶16     A petitioner may prove that a person is dangerous and warrants commitment under any of the five standards set forth in WIS. STAT. § 51.20(1)(a)2.a.-e. *See **Langlade Cnty. v. D.J.W.***, 2020 WI 41, ¶30, 391 Wis. 2d 231, 942 N.W.2d 277. James contends the County failed to establish dangerousness under § 51.20(1)(a)2.c., which provides that an individual is dangerous if he or she

> [e]vidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals. The probability of physical impairment or injury is not substantial … if reasonable provision for the subject individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of those services ….

¶17     We disagree. The record provides clear and convincing evidence that James's judgment was impaired due to his mental illness—as manifested by

his severe psychoses and hallucinations—and that there was a substantial probability that physical impairment or injury to himself or others would occur.

¶18 Bales's testimony at the commitment hearing made it clear that James was psychotic as a result of his schizophrenia. Bales found that James's judgment had been grossly impaired for a significant period of time, noting that he personally observed that James was not reality based and was defensive, irritable, paranoid and antagonistic. Bales noted that James was in denial of the gravity of his problems and was in need of psychiatric care. Additionally, James was in denial of his mental illness and refused medication because he believed the voices he heard were real. Bales also testified that James lacked the ability to comprehend his need for treatment and was self-medicating with methamphetamine.

¶19 According to Bales's report, which the circuit court considered and which was entered into evidence at the commitment hearing, James is defensive and oppositional about receiving necessary help. Even when James sought help voluntarily, he failed to recognize the significance of his illness and refused to follow recommendations regarding necessary treatment. Additionally, James sought medical care for his child due to James's paranoia and delusions rather than the child's health condition. Bales found that James's impaired judgment presented a substantial probability of physical impairment to himself based upon James's willingness to act on his delusions.

¶20 Coates's testimony also supported a determination that James was dangerous under the relevant legal standard. James admitted to Coates that he was constantly hearing voices of three people, he denied the existence of a mental illness, and he admitted to self-medicating with methamphetamine. Coates noted

that James has an illogical thought process with bizarre and paranoid delusions and auditory hallucinations. According to Coates, James's mental status was impaired to a degree so as to inhibit his ability to perform simple calculations, and James also had limited abstract thinking.

¶21 Coates noted that James was having paranoid delusions about his mother's boyfriend that caused him to carry a knife for his own protection. Coates further opined that James's paranoia and delusions about people hurting other people, his possession of a knife, and his impulsive behavior created a danger to himself or others. Coates also testified that when James is in a psychotic state, he is unable to properly care for himself and behave appropriately in a social setting.

¶22 Based on the uncontroverted testimony of Bales and Coates, the circuit court did not err by concluding that James was dangerous under WIS. STAT. § 51.20(1)(a)2.c. The court found that James suffered from a continuing pattern of impaired judgment, as evidenced by his recent hallucinations and paranoid delusions. The evidence supports the court's finding that there was clear and convincing evidence that James's untreated mental illness and his resulting impaired judgment created a substantial probability of harm to himself or others. James did not comprehend his need for treatment, and he was self-medicating with methamphetamine. Even when James pursued voluntary treatment, he failed to recognize the severity of his illness and refused to follow recommendations regarding necessary treatment. His impetuous and delusional behavior, coupled with his possession of a knife and some suggestion that he may use it, further supported the court's dangerousness conclusion. Finally, there was clear and convincing evidence that James was incapable of properly caring for himself. We therefore affirm the involuntary commitment order and the order for involuntary medication and treatment.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.