COURT OF APPEALS
DECISION
DATED AND FILED

February 26, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1443**

STATE OF WISCONSIN

Cir. Ct. No. 2023ME32

IN COURT OF APPEALS
DISTRICT II

---

IN THE MATTER OF THE MENTAL COMMITMENT OF L.L.:

SHEBOYGAN COUNTY,

    PETITIONER-RESPONDENT,

  V.

L.L.,

    RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Sheboygan County: NATASHA L. TORRY, Judge. *Affirmed.*

¶1 NEUBAUER, J.[1] L.L., referred to herein by the pseudonym Lucy, appeals from an order extending her involuntary commitment under WIS. STAT. § 51.20. She argues that the circuit court failed to make specific factual findings regarding dangerousness as required under *Langlade County v. D.J.W.*, 2020 WI 41, ¶3, 391 Wis. 2d 231, 942 N.W.2d 277, and that Sheboygan County (the "County") did not present sufficient evidence of dangerousness. As discussed in greater detail below, this court concludes that the circuit court's oral ruling and written order satisfy *D.J.W.*'s factual findings requirement and sufficient evidence exists in the record to establish dangerousness. Accordingly, this court affirms the extension order.

## BACKGROUND

### I. Statutory Framework

¶2 Wisconsin law permits an individual to be committed involuntarily if the petitioner (here, the County) proves by clear and convincing evidence that the individual is: "(1) mentally ill; (2) a proper subject for treatment; and (3) dangerous to themselves or others." *D.J.W.*, 391 Wis. 2d 231, ¶29. The petitioner must prove the same three elements by clear and convincing evidence each time it seeks to extend a commitment. *Id.*, ¶31. In this appeal, Lucy focuses solely on the element of dangerousness.

¶3 WISCONSIN STAT. § 51.20(1)(a)2.a.-e. sets out five standards that may be proved to establish dangerousness, "[e]ach requir[ing] the County to

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

identify recent acts or omissions demonstrating that the individual is a danger to [herself] or to others." *Portage County v. J.W.K.*, 2019 WI 54, ¶17, 386 Wis. 2d 672, 927 N.W.2d 509. When an individual has already been committed and an extension of the commitment is sought, the individual may not have exhibited any recent behavior demonstrating dangerousness due to the treatment he or she has received. Thus, in a recommitment proceeding, the petitioner is not required to prove recent acts or omissions for an extension; instead, the petitioner may show that there is a substantial likelihood that the individual will become dangerous should treatment lapse. *Id.*, ¶19. Section 51.20(1)(am) applies in such circumstances and provides that in lieu of recent acts, omissions, or other behaviors, dangerousness may be established "by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." This provision "functions as an alternative evidentiary path, reflecting a change in circumstances occasioned by an individual's commitment and treatment." *J.W.K.*, 386 Wis. 2d 672, ¶19. However, "even though the petitioner need not identify recent acts or omissions showing dangerousness, the petitioner must still prove a substantial likelihood that the subject individual would be dangerous under one of the five standards set forth in § 51.20(1)(a)2.a.-e. if treatment were withdrawn." *Eau Claire County v. J.M.P.*, No. 2020AP2014-FT, unpublished slip op. ¶11 (WI App June 22, 2021).

¶4 The recommitment "standard is not more or less onerous" than the standard for initial commitment; "the constitutional mandate that [a] [c]ounty prove an individual is both mentally ill and dangerous by clear and convincing

evidence remains unaltered."[2] ***J.W.K.***, 386 Wis. 2d 672, ¶24; *see also* ***D.J.W.***, 391 Wis. 2d 231, ¶34 (explaining that WIS. STAT. § 51.20(1)(am) "does not change the elements or quantum of proof required" to prove dangerousness for a commitment extension (citation omitted)). Thus, in order to extend Lucy's commitment, the County had to prove that she met one of the five statutory standards for dangerousness set forth in § 51.20(1)(a)2.a.-e., and the circuit court had to ground its decision in one or more of those standards. *See* ***D.J.W.***, 391 Wis. 2d 231, ¶31.

## II.    Lucy's Initial Commitment

¶5     Lucy was emergently detained in February 2023. A Statement of Emergency Detention filed by a police officer provided the following description of Lucy's behavior that led to her being detained:

> [Lucy] was returned home today, after running away from home and [being] listed as a missing juvenile for several days. On the way home with [her] dad, she said she was not going to be around after 24 hours and would do something during the night or early morning. She also said she would write the time down so her parents would have an approximate time of death. Later during an argument, she said she may hang herself from a door. She later said she may end her life in either the garage, basement, backyard, bedroom or bathroom. [Lucy] denied making the statements. After presenting the recording to her, she tried to come up with an excuse, and did not have a legitimate reason for making the statements. She admitted to Ofc Becker that she recently ingested Serequil [sic], which was not prescribed to her and [s]he admitted to medical staff she ingested Methamphetamine and Cocaine on 2-19-23. She said she has been on drugs for the past month since she was released from jail.

---

[2] "[E]xtension of a commitment" and "recommitment" are synonymous, and the terms will therefore be used interchangeably. ***Sheboygan County v. M.W.***, 2022 WI 40, ¶6 n.3, 402 Wis. 2d 1, 974 N.W.2d 733.

Appended to the Statement of Emergency Detention was a report from the police officer who detained Lucy and a summary from a social worker who spoke with Lucy and the officer. These documents provided additional details regarding the threats Lucy had made, which her parents recorded and relayed to the officer.

¶6 The circuit court appointed two psychiatrists, Dr. Marshall Bales and Dr. Gail Tasch, the latter of whom had been selected by Lucy pursuant to WIS. STAT. § 51.20(9)(a)2., to examine her and submit reports regarding her condition. In their respective reports, both psychiatrists recounted the suicidal threats Lucy had made to her parents, noted that her parents had recorded her statements, and also noted that Lucy had recently been using illegal drugs. Bales described her as "totally unwilling to get mental health care on a voluntary basis." Tasch noted similarly that Lucy had "said she would not cooperate with care at the hospital" and "plans to continue her same behavior, which led to expressing suicidal thoughts, drug use and becoming a potential trafficking victim."

¶7 Bales and Tasch disagreed as to whether Lucy met the legal standard for involuntary commitment. Bales opined that Lucy was mentally ill and drug dependent; he diagnosed her with disruptive mood dysregulation disorder, oppositional defiant disorder, and polysubstance abuse and dependence. Bales also opined that she was a proper subject for treatment and dangerous because she showed a substantial probability of physical harm to herself and others. WIS. STAT. § 51.20(1)(a)2.a.-b.

¶8 Tasch disagreed. She concluded that Lucy "has severe behavior problems and … is totally out of control," but "does not meet criteria for a major

5

psychiatric illness."[3]  Tasch acknowledged that Lucy "is a threat to herself and possibly others but not from mental illness."  She described Lucy's "symptoms [as] behavioral in origin and not amenable to psychiatric medication."  She described Lucy's "threats of suicide [as] manipulations to get what she wants."  Tasch recommended that the WIS. STAT. ch. 51 proceeding be dismissed and that Lucy be "place[d] in a residential treatment setting … where she can receive the care and structure she requires."

¶9      Despite these conflicting opinions, Lucy stipulated to a six-month commitment pursuant to WIS. STAT. § 51.20 in March 2023.  In a written stipulation filed with the circuit court, Lucy "stipulate[d] to the allegations in the petition for commitment" and "agree[d] that there is sufficient evidence for the court to" determine that she was mentally ill, a proper candidate for treatment, and dangerous.  (This court understands "the petition for commitment" referenced in the stipulation to be the Statement of Emergency Detention and attachments.)  Based on Lucy's stipulation, the circuit court entered an order committing her for six months at a locked facility.

### III.    Extension Proceedings

¶10     In July 2023, the County filed a petition to extend Lucy's commitment for an additional twelve months.  The circuit court scheduled a hearing on the petition and appointed Bales to examine Lucy and submit another report on her condition.

---

[3] Tasch did acknowledge that Lucy met the criteria for conduct disorder and oppositional defiant disorder.

¶11     In his report, which was admitted into evidence at the hearing over Lucy's hearsay objection, Bales again opined that Lucy suffers from disruptive mood dysregulation disorder, oppositional defiant disorder and polysubstance abuse. He recounted the circumstances surrounding her initial detention in February 2023 and noted that she had taken "methamphetamine and cocaine and possibly other drugs." Bales wrote that Lucy had run away again in March 2023, after which she was "returned to [a] more restrictive" placement because she was not "psychiatrically stable." "Over the last few months," he wrote, Lucy "has been superficially compliant with her commitment, but has been noted to be basically only doing what she has to to 'stay out of the hospital.'" He noted further that Lucy's "psychiatrist, case manager[,] and … parents all suggest extension [of her commitment] in view that [Lucy] would in all likelihood not pursue mental health care or therapy on a voluntary basis. She is viewed generally as a high risk for even more drug use were a commitment not in place."

¶12     With respect to her presentation during the examination, Bales described her as "subdued and dysphoric" but not exhibiting any "acute symptoms" or "indications of psychosis or mania." He also noted that Lucy "denied being suicidal" and "was not threatening."

¶13     Bales concluded that Lucy was mentally ill, drug dependent, and a proper candidate for treatment. As to the issue of dangerousness, Bales checked a box on his report next to the first standard in WIS. STAT. § 51.20(1)(a)2.a., indicating that she was dangerous because she presented "[a] substantial probability of physical harm to [herself] as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm." Bales also cited the alternative standard in § 51.20(1)(am), writing that Lucy had "made clear that she will not pursue mental health care voluntarily. Without a commitment in place

and with reports of some continued drug or alcohol abuse she is going to be at high risk for relapse with worsening drug use or with more depression."

¶14    The circuit court held a hearing on the petition on August 29, 2023. Bales was the only witness to testify. Consistent with his report, Bales testified that Lucy suffers from disruptive mood dysregulation disorder, noting that she "had been known to have significant mood swings, highs and lows in mood." He explained that Lucy's mood disorder was "complicat[ed by] … a very distinctive oppositional defiance disorder" and by "a definite substance abuse problem." Bales noted Lucy had tested positive for marijuana and cocaine when she ran away from home and explained that stopping drug and alcohol use was a necessary step to treat her mood disorder. He testified that Lucy is treatable, noting that she displayed "average intelligence" and "has a lot of skills and talents."

¶15    Bales agreed that Lucy would be substantially likely to be a proper candidate for treatment if her commitment ended. Expanding on that opinion, Bales testified that Lucy is "really vulnerable. And even when she ran off, she was telling me she stayed with people that were bordering on being random. And she's just very vulnerable, for lack of a better word, or endangered would be another word. But—but also she has been suicidal at times." Bales also noted that Lucy "had made suicidal threats leading to" her being placed in a "more restrictive" placement. Lucy's counsel objected to this testimony as hearsay but the circuit court overruled the objection after the County explained that the testimony was "admi[ssible] to help support [Bales'] underlying opinions." Bales then clarified that Lucy told him "she may have made suicidal threats."

¶16    Bales also confirmed that he did not believe Lucy would voluntarily undergo mental health treatment, noting that she had previously told him, "I help myself" and had described her involuntary commitment as "stupid." Bales also noted that Lucy had not taken medication during the times she had run away from home, instead choosing to use illegal drugs, and he described her history as "such that she simply will not pursue mental health care voluntarily." Absent treatment, Bales believed her mood disorder symptoms would worsen and that she might become suicidal.

¶17    On cross-examination, Bales agreed he had not noted any suicide threats since February 2023 nor any actual suicide attempts in his report. He also acknowledged that Lucy "disputed that she was suicidal leading to the current inpatient state" but stated that "she was definitely downplaying all the problems leading to readmission."

¶18    The County did not mention any of the five statutory standards for dangerousness in its brief closing remarks, but Lucy's counsel argued that she was not dangerous under the first standard, which he understood to be "the standard under which Dr. Bales claims that she's dangerous." Following the parties' arguments, the circuit court concluded that the County had carried its burden of proving that an extension of Lucy's commitment was warranted:

> THE COURT: All right. Thank you. Well, this is definitely not the—the most simple case, in that we're hearing that [Lucy] suffers from a mental illness but that—that's compounded by her drug use and—and potentially by the fact of—that she's not even 18 years old yet and does not have—she's not an adult. Her brain is not developed. I do find, at this point, that there are grounds for the extension of commitment, that she is mentally ill, specifically that she suffers from mood disorder but also that she's drug dependent.

9

> And that is a ground that can be used for—for this commitment as well, and that was testified to and indicated in Dr. Bales's report. That her mental illness and drug dependency creates a substantial probability of harm to herself and that, even recently, she is using cocaine, marijuana, and, from one of the reports, it appears that potentially meth. And that these—the use of these substances can cause serious injury, serious physical debilitation, it could also—they could also cause death. And I do believe that she's in need of treatment. Again, that she's recently been in use of illicit substances, that she's recently ran away, that when she has run away, that she has not been receiving treatment that she needs. I also believe that there's been shown today that there's a substantial likelihood that—based on her record—that she would be a proper subject for commitment if she were not receiving treatment that she needs.

¶19 In a written order entered after the hearing, the court checked a box indicating its determination that Lucy was "mentally ill," but did not check the box next to "drug dependent." With respect to dangerousness, the court checked boxes next to the first and fourth standards. *See* WIS. STAT. § 51.20(1)(a)2.a., d. The court further indicated that dangerousness under these standards had been established by (1) "a recent overt act, attempt or threat to act" and (2) "a substantial likelihood, based on [her] treatment record, that [she] would be a proper subject for commitment if treatment were withdrawn."

## DISCUSSION

### I. Compliance with *D.J.W.*

¶20 Lucy contends that the circuit court erred by not making the findings required under *D.J.W.* In that case, our supreme court held that "circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. on which the recommitment is based." *D.J.W.*, 391 Wis. 2d 231, ¶3. The court imposed this

requirement for two reasons. First, it is intended to "provide[] clarity and extra protection to patients regarding the underlying basis for a recommitment." ***Id.***, ¶42. Given the significant liberty interests that can be curtailed by involuntary commitment, the specific factual findings requirement is designed "to ensure that recommitments are based on sufficient evidence." ***Id.***, ¶43. Second, ***D.J.W.***'s specific factual findings requirement is intended to "clarify issues raised on appeal ... and ensure the soundness of judicial decision making, specifically with regard to challenges based on the sufficiency of the evidence." ***Id.***, ¶44.

¶21     As this court has explained, "***D.J.W.*** requires a circuit court to provide *both* the applicable subdivision paragraph *and* specific factual findings to support a recommitment decision." ***Ozaukee County v. J.D.A.***, No. 2021AP1148, unpublished slip op. ¶25 (WI App Dec. 15, 2021). Moreover, because the conclusion that an individual is dangerous is a legal determination rather than a factual one, "the 'specific factual findings' contemplated by ***D.J.W.*** must mean findings more specific than the court's ultimate legal conclusion of dangerousness." ***Waupaca County v. J.D.C.***, No. 2023AP961, unpublished slip op. ¶14 (WI App Sept. 14, 2023). Thus, a circuit court must do more than merely "[r]ecit[e] the language of the statute without discussing the specific facts supporting its legal conclusions." ***J.D.A.***, No. 2021AP1148, ¶17. Instead, it must "engage with the evidence by making specific findings of evidentiary fact, helping ensure that these proceedings reflect their 'serious nature.'" ***J.D.C.***, No. 2023AP961, ¶18.

¶22     As Lucy notes, the circuit court did not specifically refer to any of the statutory standards for dangerousness in its oral ruling. However, the court indicated in its written order that it had determined Lucy to be dangerous under the first standard and the recommitment alternative in WIS. STAT. § 51.20(1)(am).

11

Bales also cited the first standard in his written evaluation of Lucy, and Lucy's counsel cross-examined Bales about this standard and cited it in his closing argument. Together, the court's oral ruling and written order, along with the evidence presented at the recommitment hearing, lead this court to conclude that the proceedings in the circuit court satisfied the purposes underlying the ***D.J.W.*** directive. Lucy knew which dangerousness standard the County was invoking to recommit her, and the court's oral ruling and written order apprise this court of which standard it applied and its reasons for doing so.

¶23    Turning to the circuit court's factual findings, Lucy argues they are insufficient to establish dangerousness under the first standard. Under that standard, an individual is dangerous if he or she "[e]vidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm." WIS. STAT. § 51.20(1)(a)2.a. Lucy contends that the court did not find that she had threatened to harm herself, but her argument overlooks the County's reliance on the recommitment alternative in § 51.20(1)(am).

¶24    Under that standard, the court was not obliged to make findings of fact regarding recent threats of harm. Instead, the court could—and did—make findings regarding Lucy's treatment history and the likelihood that she would become dangerous if her commitment lapsed. The court found that Lucy's mental illness and history of illegal drug use "create[d] a substantial probability" of self-harm because the drugs she had used could cause "serious injury, serious physical debilitation," or death. The court further found that in addition to her recent drug use, Lucy had recently run away and, during that time, had "not been receiving treatment that she needs." After making these findings about her history, the court concluded that the County had carried its burden under the

alternative standard to show "that there's a substantial likelihood that—based on her record—that she would be a proper subject for commitment if she were not receiving treatment that she needs." The court's findings engaged with the evidentiary record and referenced specific phrases from both the first standard and the § 51.20(1)(am) alternative. Together with the recommitment order, they are sufficient to satisfy *D.J.W.* [4]

## II.  Sufficiency of the Evidence

¶25  Lucy next contends that the County did not present sufficient evidence to establish dangerousness. She first argues that evidence that she had made suicidal threats "largely came in the form of hearsay from Dr. Bales" that should not have been admitted. Citing this court's decision in *Walworth County v. Therese B.*, 2003 WI App 223, ¶8, 267 Wis. 2d 310, 671 N.W.2d 377, Lucy argues that the Bales' reliance on those "allegations" in forming his opinions "*does not transform the hearsay into admissible evidence*." She then argues that

---

[4] The circuit court also cited the fourth standard in its written order, a standard that neither the parties nor Bales contended was applicable. Under that standard, an individual is dangerous if he or she

> [e]vidences behavior manifested by recent acts or omissions that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness.

WIS. STAT. § 51.20(1)(a)2.d. As Lucy notes, the court did not make any findings of fact in its oral ruling regarding Lucy's purported inability to "satisfy her basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment." However, because the court's findings with respect to the first standard are sufficient under *D.J.W.*, the court's invocation of the fourth standard is not a basis to reverse the recommitment order.

13

absent the inadmissible hearsay, the record contains insufficient evidence of dangerousness because it "primarily consist[s] of testimony regarding Lucy's use of drugs," which by itself is not sufficient to establish dangerousness under either the first or fourth standards.

¶26 In response, the County does not challenge Lucy's characterization of the evidence regarding her suicidal threats as hearsay but rather argues that other evidence was sufficient to establish, under the first standard and the WIS. STAT. § 51.20(1)(am) recommitment alternative, that if Lucy's treatment lapsed, she would not take medication voluntarily and would engage in the same dangerous behavior that prompted her initial detention. Lucy contends that this other evidence is not sufficient by itself because "there was no admissible evidence provided regarding the original dangerous behavior for which Lucy was committed."

¶27 This court is not persuaded by Lucy's arguments. Her position appears to be that the County was obliged to introduce admissible evidence at the recommitment hearing to prove that she actually made threats of suicide before her initial detention. This court disagrees. Assuming that Bales' testimony at the hearing and the portions in his report discussing her prior suicidal threats, were inadmissible hearsay and should not have been considered as evidence of past dangerousness, Lucy overlooks the impact of her stipulation in connection with her initial commitment. As part of that stipulation, Lucy "stipulate[d] to the allegations" in the Statement of Emergency Detention and agreed "that there [was] sufficient evidence for the court" to conclude that she was dangerous. The Statement of Emergency Detention set forth a summary of the behavior that led to her emergency detention. It recounted information about her suicidal threats that her parents provided to the police officer who detained her. Although the

14

Statement of Emergency Detention also noted that Lucy denied making suicidal statements, it stated further that the officer played a recording of the statements that Lucy's parents had shared with him and that Lucy "tried to come up with an excuse" but "did not have a legitimate reason for making the statements." By stipulating to the allegations in the Statement of Emergency Detention, Lucy admitted that she had, in fact, made statements threatening suicide and that they provided a sufficient basis for the initial determination of dangerousness.

¶28 Even if the circuit court erred to the extent that it considered Bales' statements about Lucy's suicidal threats at the extension hearing, Lucy's earlier stipulation that she made those statements remains part of the record and would provide a sufficient basis for the circuit court to find that the threats were made. In addition to the stipulation, Bales testified that if Lucy's treatment were withdrawn, she would likely not continue it voluntarily. That, in Bales' view, could lead to a possible relapse in her drug use and would likely cause her mood disorder symptoms to worsen. Bales agreed that her worsening symptoms would cause her to "become potentially suicidal in the future." This testimony, along with the stipulation and Bales' report, establish a substantial probability that Lucy would become a danger to herself if her involuntary treatment were discontinued. Thus, this court concludes that sufficient evidence exists in the record to establish that Lucy is dangerous under the first standard and the WIS. STAT. § 51.20(1)(am) recommitment alternative.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.